In re **TRANSIT COMPANY TIRE ANTITRUST LITIGATION.**
**M.D.L. No. 111.**
**Nos. 20688–4, 20689–4 and 20411–4.**

United States District Court,
W. D. Missouri, W. D.
Jan. 15, 1975.

David Berger, Philadelphia, Pa., Fredric B. Burns, Miami, Fla., Albert Thomson, Harry P. Thomson, Jr. (Liaison Counsel), Kansas City, Mo., for plaintiffs.

William H. Sanders, Thomas J. Wheatley, David K. Hardy, Paul Scott Kelly, Jr. and Alvin D. Shapiro (Liaison Counsel), Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

### DENYING PLAINTIFFS' MOTIONS FOR ORDER DETERMINING THAT ACTIONS BE MAINTAINED AS CLASS ACTIONS

ELMO B. HUNTER, District Judge.

On November 17, 1972, the Judicial Panel on Multidistrict Litigation transferred to this Court, pursuant to 28 U.S.C. § 1407, the following civil actions:

W.D. Mo.

| CENTRAL DISTRICT OF CALIFORNIA | Assigned Number |
|---|---|
| Southern California Rapid Transit District Alameda-Contra Costa Transit District; Transit Authority of the City of Sacramento; City of Fresno, a charter city, San Diego Transit Authority v. Goodyear Tire & Rubber Co.; Firestone Tire & Rubber Co.; Uniroyal, Inc.; B. F. Goodrich Co.; General Tire & Rubber Co., Civil Action No. 72–1479–FW | No. 20686–4 |

### NORTHERN DISTRICT OF CALIFORNIA

City and County of San Francisco v. Goodyear Tire & Rubber Co.; Firestone Tire & Rubber Company; Uniroyal Inc.; B. F. Goodrich Company; and General Tire & Rubber Company, Civil Action No. 72–1183–RFP — No. 20687–4

### EASTERN DISTRICT OF PENNSYLVANIA

City of Cleveland, Transit Division, v. Goodyear Tire & Rubber Co.; Firestone Tire & Rubber Co.; Uniroyal, Inc.; B. F. Goodrich Co.; General Tire & Rubber Co., Civil Action No. 72–718 — No. 20688–4

### SOUTHERN DISTRICT OF FLORIDA

Dade County, Florida, v. Goodyear Tire & Rubber Co.; Firestone Tire & Rubber Co.; Uniroyal Inc.; B. F. Goodrich Co.; and General Tire & Rubber Co., Civil Action No. 72–826 — No. 20689–4

Uniroyal, Inc. vs. Transit Company of the Palm Beaches, Inc.; Turfway Lines, Inc.; and Transit Company of Daytona Beach, Inc., Civil Action No. 71–1672–CF — No. 20690–4

### WESTERN DISTRICT OF MISSOURI

D. L. Brenner; M. J. Coen; Charles Hanson; A. D. Martin; Albert Thomson; and Edwin B. Wright, Trustees for Kansas City Transit, Inc. v. Goodyear Tire & Rubber Co.; Firestone Tire and Rubber Company; Uniroyal, Inc.; B. F. Goodrich Company; and General Tire & Rubber Co., Civil Action No. 20411–4 — No. 20411–4

Of these civil actions, the following are brought as class actions under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure:

### EASTERN DISTRICT OF PENNSYLVANIA

City of Cleveland, Transit Division, v. Goodyear Tire and Rubber Co., et al., Civil Action 72–718 — No. 20688–4

### SOUTHERN DISTRICT OF FLORIDA

Dade County, Florida v. Goodyear Tire & Rubber Co., et al., Civil Action No. 72–826 — No. 20689–4

### WESTERN DISTRICT OF MISSOURI

D. L. Brenner, et al. v. Goodyear Tire & Rubber Co., et al., Civil Action No. 20411–4 — No. 20411–4

In these three cases, plaintiffs each seek to represent that class of persons consisting of all transit companies, bus companies or transit authorities within any state or territory of the United States, the District of Columbia, or the Commonwealth of Puerto Rico who have leased special mileage commercial tires from any of the named defendants during the period commencing in 1934 or 1940 and ending June 29, 1971. It is alleged that this class consists of approximately 750 entities.

Upon transfer to this Court, all six of the above-entitled cases were consolidated for purposes of pretrial proceedings by order of this Court filed on December 4, 1972. Following the initial pretrial conferences held in these consolidated cases on January 27, 1973, the Court, by orders filed on February 5, 1973, appointed liaison counsel for plaintiffs and for defendants, and set forth the duties of liaison counsel. See Manual for Complex Litigation, Pt. I, § 1.90 (1973 ed.). In addition, by order filed February 5, 1973, the Court specifically limited pretrial discovery in these consolidated cases to the issues pertaining to the Rule 23(a) and (b)(3)—Class Action—allegations raised in the complaints filed in civil actions numbered 20688-4, 20689-4, and 20411-4 referred to hereinabove. Mutual discovery on these limited issues commenced on March 1, 1973, and terminated on or about April 1, 1974.

On March 29, 1974, the Court issued its order setting the date for the full evidentiary hearing on the issues raised by the class action allegations, and established procedures for the preparation for and conduct of the hearing. Following the submission of the final prehearing order on May 21, 1974, the Court called Civil Actions Numbered 20688-4, 20689-4, and 20411-4 for a full evidentiary hearing commencing May 28, 1974.

Post-hearing briefing was completed on July 16, 1974.

Initially, it should be noted that the City of Cleveland, Transit Division; Dade County, Florida; and D. L. Brenner, et al., as Trustees of Kansas City Transit, Incorporated, desire to represent the same class of plaintiffs in their three separate civil actions. Prior to the evidentiary hearing in these cases, and in response to the Court's order which directed these named plaintiffs to designate which plaintiff or plaintiffs would seek to represent the alleged class of plaintiffs, the three plaintiffs advised the Court as follows:

"Plaintiffs in this consolidated antitrust litigation seeking to represent a class have agreed as to the parties which plaintiffs select as representatives of the proposed class of plaintiffs. Such agreed representatives are the named parties as follows:

1. City of Cleveland, Transit Division, as more fully described in Part II A of Plaintiffs' Consolidated Narrative Statement of Facts filed April 19, 1974.

2. D. L. Brenner, M. J. Coen, Charles Hanson, Albert Thomson, Edwin B. Wright, and A. D. Martin as more fully described in Part II B of Plaintiffs' Consolidated Narrative Statement of Facts filed April 19, 1974.

3. Metropolitan Dade County Transit Authority as more fully described in Part II C of Plaintiffs' Consolidated Narrative Statement of Facts filed April 19, 1974.

Counsel for the respective parties plaintiff in this consolidated antitrust litigation have been consulted by liaison counsel and the above described representatives have been designated as representatives of the class by agreement of counsel." [1]

---

1. Plaintiffs' Consolidated Narrative Statement of Facts filed on April 19, 1974, Parts II, A, B, and C, state in detail those facts alleged

by plaintiffs which purportedly establish each of the individual plaintiff's qualifications to proceed as representative of the alleged class.

■ This "Agreement" of the three plaintiffs seeking to be designated as class representative in their individual action immediately presents several problems. Civil actions Numbered 20688–4, 20689–4 and 20411–4, have been transferred to this district under the provisions of 28 U.S.C. § 1407 for coordinated or consolidated pretrial proceedings. Under the provisions of Section 1407(a) "Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated." See also, Rule 15, Rules of Procedure of the Judicial Panel on Multidistrict Litigation. Clearly, the individual actions which have been transferred to this district and assigned the designation "MDL Docket No. 111" have not been consolidated for all further proceedings, including trial, under the provisions of Rule 42(a) of the Federal Rules of Civil Procedure. Therefore, notwithstanding the Section 1407 transfer, Civil Actions numbered 20688–4, 20689–4, and 20411–4 remain separate civil actions for purposes of determining the parties to those actions, for purposes of determining if those parties shall be permitted to act as representative of the class alleged in their individual complaints, and for all other purposes other than pretrial proceedings.

■ Plaintiffs' "Agreement" that the three mentioned plaintiffs will jointly represent a class of plaintiffs in the three separate civil actions which are pending before this Court has not been accompanied by any procedural steps which would make this "Agreement" workable. The plaintiffs seeking to represent the same class of plaintiffs have not moved for the consolidation of their three individual civil actions under the provisions of Rule 42(a) of the Federal Rules of Civil Procedure. There has been no designation as to which of the three separate civil actions plaintiffs desire to proceed with as the class action case. There has been no motion by any of the plaintiffs to dismiss their individual action without prejudice or join as a party plaintiff in any other action brought as a class action, and none of the party plaintiffs has advised the Court why it is necessary to have three representative plaintiffs in any one of these three class actions, or why it is necessary to have numerous attorneys from at least five different law firms as counsel for the representatives of the proposed class of plaintiffs.[2] In summary, the "Agreement" filed by plaintiffs City of Cleveland, Transit Division, Dade County, Florida, and D. L. Brenner, et al., is of no operative effect in this matter as it has not been accompanied with the procedural steps necessary to achieve the consolidation of these three actions into a single civil action on behalf of the named plaintiffs and "persons" similarly situated. Assuming, *arguendo*, that such necessary procedural steps had been taken, the record as it now stands would not permit all of these individual plaintiffs to actively participate through their numerous attorneys in the prosecution of their claims on behalf of the alleged class in any one of the three pending class actions. Clearly, such joint participation would result in inordinate attorneys fees to be paid out of the recovery obtained on behalf of the alleged class. Accordingly, the "Agreement" filed by the plaintiffs in Civil Actions numbered 20688–4, 20689–4, and 20411–4 is deemed to be of no

---

2. The evidence adduced at the evidentiary hearing on this matter reveals that plaintiff City of Cleveland Transit Division is represented by five or six attorneys from two law firms; that plaintiff Dade County, Florida is represented by two attorneys from one law firm; and that plaintiffs D. L. Brenner, et al., are represented by two or three or more attorneys from at least two law firms. The Court has a duty in class action litigation to prevent the potential for unreasonable charges for attorneys fees. See Manual for Complex Litigation, § 1.47, Part I (Jan. 1, 1973 ed.).

force or effect in the determination of whether any of those plaintiffs seeking to do so shall be permitted to act as representative of the alleged class of plaintiffs, and each of the individual actions will be treated separately where required in determining if any of these actions shall be maintained as a class action under Rule 23, F.R.Civ.P.[3]

## THE COMPLAINTS

The plaintiffs' initial pleadings in the three actions brought as class actions are identical in all material respects. Generally, the allegations are that the defendants have combined and conspired in violation of Section 1 of the Sherman Act to market "Special Mileage Commercial Tires" (SMC Tires) in a restrictive manner through the use of a "lease only" policy and the requirement that the lessee "buy-out" or purchase its entire inventory of leased tires upon the termination or failure to renew the lease. Plaintiffs allege that the effect of these practices has been to unreasonably restrain trade, and has resulted in an allocation of markets and customers among the five defendants with a stabilization of prices above competitive levels. Additionally, it is alleged that the defendants, acting individually and in concert have conspired to and have in fact monopolized the market for "Special Mileage Commercial Tires" in violation of Section 2 of the Sherman Act.

Plaintiffs do not request equitable or declaratory relief concerning the alleged practices, but merely demand monetary damages in the amounts paid over and above the competitive price level they and class members would have paid for the use of Special Mileage Commercial Tires during the period of time commencing when defendants allegedly initiated the restrictive leasing policies. Pursuant to Section 4 of the Clayton Act, plaintiffs demand, on behalf of themselves and class members, treble damages, costs, and attorneys' fees.

In Count I of their complaints, plaintiffs make the following specific allegations in support of their general allegation of violation of Section 1 of the Sherman Act:

Beginning at least as early as 1934, 1940 or 1950 and continuing thereafter (until June 29, 1971) defendants have throughout the United States individually and in concert engaged in unlawful activities which have restrained interstate trade and commerce in special mileage commercial tires. Defendants in furtherance of these violations:

(1) have refused to sell special mileage commercial tires to transit companies;

(2) refused to supply special mileage commercial tires except on a lease basis, whereby the transit company is obligated to obtain its total requirements or substantially all of its requirements of tires from the defendant-lessor throughout the duration of the lease agreement;

(3) refused to provide servicing and regrooving of special mileage commercial tires except in conjunction with and as an integral part of a leasing agreement for tires;

(4) required that at the termination of an existing bus mileage tire lease agreement, the transit company must renew said lease with the existing de-

3. It is readily apparent that plaintiffs City of Cleveland, Transit Division, Dade County, Florida, and D. L. Brenner, et al., all seek to act as representative for the identical class of potential plaintiffs. It is further apparent that unless the total class of potential plaintiffs is divided into separate groups for purposes of representation, only one of these plaintiffs seeking to do so may be al-

lowed to act as class representative. To permit two or three separate actions to proceed, all of which represent the same class or persons on the same cause of action, would result in duplication of effort, possible inconsistent judgments, and defeat the purposes for which Rule 23, F.R.Civ.P. was established.

fendant-lessor or purchase all of the special mileage commercial tires then identified to the terminated lease agreement;

(5) inflated, padded or loaded the inventory of special mileage commercial tires prior to the expiration of an existing lease agreement;

(6) refused to bid on or lease special mileage commercial tires to major transit companies supplied by another defendant manufacturer;

(7) employed deceptive practices and techniques and secret agreements to avoid detection of the alleged practices so as to fraudulently conceal said violations.

It is alleged that these acts and practices, individually and in concert, have had the following effects:

(a) the commerce of special mileage commercial tires has been unreasonably restrained;

(b) actual and potential competitors of defendants have been excluded and prevented from manufacturing and distributing special mileage commercial tires;

(c) competition among defendants has been curtailed and eliminated;

(d) purchasers and lessees of special mileage commercial tires have been denied the benefits of a free and competitive market;

(e) customers for special mileage commercial tires have been allocated among defendants;

(f) prices of special mileage commercial tires leased or sold by defendants were raised, fixed, stabilized and maintained at noncompetitive levels.

In Count II of their complaints, plaintiffs make the following specific allegations in support of their general allegation of violation of Section 2 of the Sherman Act:

(1) Beginning at least as early as 1934, 1940 or 1950 and continuing thereafter (until June 29, 1971) the defendants combined, conspired and acted in concert to monopolize the mentioned interstate trade and commerce in violation of Section 2 of the Sherman Act.

(2) The violations consisted of a continuing agreement, understanding, and concert of action among the defendants the terms of which are set forth in Count I.

(3) For the purpose of formulating and effectuating the agreement, understanding and concert of action, defendants and co-conspirators have done those things set forth in Count I they conspired and agreed to do.

(4) The effects of these violations are as set forth in Count I.

In Count III of their complaints, plaintiffs reallege Counts I and II, and in addition allege the following:

(1) Defendants monopolized the mentioned trade and commerce in special mileage commercial tires commencing at least as early as 1934, 1940 or 1950 and continuing thereafter (until June 29, 1971).

(2) Pursuant to and in effectuation of the monopolization the defendants performed the acts to accomplish the things described in Count I.

(3) Said monopolization had among other things the effects set forth in Count I.

### FINDINGS OF FACT

(a) *Special Mileage Commercial Tires*

The stipulations and evidence received by the Court, reveal the following pertinent facts.

The defendants in these consolidated cases are the sole manufacturers and suppliers of "Special Mileage Commercial Tires" in the United States.[4] "Spe-

4. Tire manufacturers other than these defendants manufacture tires that are sometimes used on buses, however, those tires are not classified as Special Mileage Commercial Tires.

cial Mileage Commercial Tires" (SMC Tires) also referred to as "special mileage bus tires," "bus tires," "bus mileage tires," or "transit tires," are tires that are specially manufactured and constructed for use on buses or similar passenger transit vehicles. SMC Tires, consisting primarily of a carcass, tread, undertread, sidewalls, and bead, are manufactured in differing sizes, types, and ply ratings. These differences consist of: (1) differences in tread design; (2) differences in skid depth; (3) differences in undertread depth; (4) differences in sidewall construction; (5) differences in bead design; (6) differences in the number of plys in the carcass; (7) differences in the ply rating of the carcass; (8) differences in the material used to construct the carcass or plys; (9) differences in "compound" or chemical composition of the material (rubber) used to construct various parts of the tire; (10) differences in tire diameter and width; and (11) whether the tire contains a tube or is tubeless.[5]

The differences in the various sizes, types, and ply ratings of SMC tires are due to the numerous factors which can effect the life of a tire, the mileage which it can obtain, its ride characteristics, its handling characteristics, and its likelihood of failure while in use. To some degree, the life, mileage capability, ride, handling, and failure possibility of a particular tire all depend on the construction, size, ply rating, type, and other aspects of the tire as related to the use to which the tire is exposed. For example, tire wear and life may be affected by variations in tread design, skid depth, wheel design, vehicle design and weight, climate, type of terrain, street or highway composition, inflation pressures, balancing, maintenance practices, frequency of stops and starts of the vehicle, duration of sustained operation, braking practices, driver habits, and numerous factors in use and construction. Because of the numerous factors which affect tire life, wear, ride, handling, and safety, and because of the variables involved in these factors, the defendant manufacturers of transit vehicle tires have developed different types and sizes of SMC tires which are specifically designed and suited for use under different types of transit operations. Generally, these SMC tires fit into three broad categories relating to usage. These categories are: (1) Intra-City tires; (2) Freeway or City-Suburban tires; and (3) Inter-City tires.[6]

The first category, Intra-City tires, are designed for use on buses which make frequent starts and stops and operate at speeds not in excess of thirty-five miles per hour. They generally have a thicker undertread than other SMC tires to permit regrooving of tread pat-

---

5. The "tread" of a tire is the rubber portion of the tire which contacts the road surface, and has designs or patterns or grooves cut or molded into it to effect the tire's traction and steering capabilities. The "skid depth" of a tire is the dept of the designs or patterns cut or molded into the tread. The "undertread" of a tire is the portion of rubber over the carcass and under the tread. The "carcass" of a tire is that part which is constructed of layers of cords, and the term "ply" refers to the number of layers of cord in the carcass. The term "ply rating" refers to the relative strength of the plys, regardless of the actual number of plys in the carcass. The "bead" is that portion of the tire which contracts the wheel or rim. The "sidewall" is that portion of the tire between the edge of the tread and the bead.

Tires are referred to by size utilizing a two-figure phrase. The first figure refers to the width of a cross section of the tire at its widest point between the sidewalls under normal load at recommended inflation. The second figure refers to the diameter of the wheel or rim on which the tire is designed to be mounted. For example, a tire, size 11.00 x 20 (inches), has 11 inch cross sectional width and is designed to fit a 20 inch wheel.

6. Each defendant herein manufactures and markets Intra-City, Freeway or City-Suburban, and Inter-City tires, with the exception of General Tire & Rubber Company which does not manufacture or market an Intra-City type tire.

terns after the original tread has worn down, and some have a thicker sidewall construction to withstand hazards of cuts and bruises from frequent striking of curbs. Because of their construction, Intra-City SMC tires tend to build up internal heat when operated at high speeds, and generally cannot be safely utilized on vehicles which operate at sustained high speeds.

Freeway or City-Suburban SMC tires are designed specifically for use on vehicles which operate in interurban service at speeds not in excess of 55 miles per hour for a period of time not to exceed one hour with infrequent starts and stops. This SMC tire generally has a medium undertread thickness, and can sometimes, like the Intra-City SMC tire, be regrooved.

The Inter-City SMC tire has thinner treads and sidewalls than either the Intra-City or City-Suburban SMC tires. The Inter-City SMC tires are designed for a sustained high speed use on inter-city highways. Inter-City SMC tires can safely be used in intra-city or city-suburban service, but when in that service will normally deliver less mileage than SMC tires specifically designed and constructed for that service. However, Intra-City SMC tires and some City-Suburban SMC tires cannot normally be used in Inter-City service, without an increased likelihood of tire failure.

Each of the three broad categories of SMC tires has within it numerous differences in tire size, type, and construction. For example, there are various sizes and types of Inter-City SMC tires, Intra-City tires, and City-Suburban tires, depending on the tire manufacturer and the use for which the specific tire is to be put within its category of service. These differences among the categories and within the categories are exemplified by the fact that during the year 1972 Firestone produced some thirty different models and sizes of SMC tires, B. F. Goodrich produced some twelve different models and sizes of SMC tires, and Goodyear produced some 35 different models and sizes of SMC tires. During the period 1967 to 1972, General Tire and Uniroyal each produced some sixteen different sizes and models of SMC tires.

(b) *Special Mileage Commercial Tire Marketing*

It is readily apparent that because transit vehicles can operate in intra-city, city-suburban, or inter-city service on inter-city tires or on commercial or "truck-type" tires other than special mileage commercial tires, one of the purposes for the development of the special mileage commercial tires was to obtain the maximum wear, life, mileage, and use from each tire manufactured for use on a transit vehicle. As the name "special mileage commercial tire" implies, and the evidence presented establishes, the tire manufacturers' chief concern in the manufacture and recommended use of special mileage tires is to obtain, within the limits of safety, the maximum tire life from each tire marketed to a transit vehicle operator.

The obvious reason for these efforts on the part of manufacturers of transit vehicle tires is that commencing about 1930, transit companies began to acquire tires on a lease basis with the lease rates based on either "tire mileage" or "bus mileage" actually placed on the tire, as opposed to a flat lease rate per tire. With the institution of this practice, whatever the reason therefor, by supplying the lessee with tires that achieve greater mileage, or which could be regrooved, the supplier could increase his return per tire, assuming that the increased cost of the special mileage tire was less than the additional revenue received as a result of the increased "tire mileage" or "bus mileage" obtained.[7]

7. Theoretically, by achieving greater mileage from a particular tire without overriding costs in manufacture the tire supplier could either increase his profit or lower the cost per mile which the lessor pays to better the supplier's position in a competitive market.

Since the inception of transit tire leasing practices, the industry has followed the general practice of basing lease rates on either "bus mileage" or "tire mileage" actually run by the lessee.[8] The rental charge for the use of SMC tires throughout the industry has been computed by the multiplication of the average "bus mileage" or "tire mileage" by the "base" or "basic mileage rate" made applicable to a particular lease. The "base" or "basic mileage rate" may differ from lease to lease and from tire to tire within a particular lease depending on the size or type of SMC tire supplied and upon other factors pertaining to the operation of the particular lessee, and is usually expressed in hundredths, thousandths or ten-thousandths of a cent. Ordinarily, the "base" or "basic mileage rate" is adjustable with changes in the market prices of rubber, fabric, labor, or other factors which may affect the manufacturing costs of tires, and, depending on the terms of the lease, may include varying charges for varying amounts of tire service supplied by the lessor. Since the inception of leasing practices, most leases have contained a provision whereby the lessee's rate is reduced for tire or bus mileage obtained in excess on a specific amount of mileage. This excess mileage, generally referred to as "bonus mileage" is billed to the lessee at a reduced rate and is designed to provide an incentive to the lessee to obtain the maximum mileage from each tire supplied.[9]

The SMC tire industry in the United States has been widely scattered with manufacturing plants in Danville, Virginia; Los Angeles, California; Akron, Ohio; Nashville, Tennessee; Oaks, Pennsylvania; Miami, Oklahoma; Mayfield, Kentucky, and Waco, Texas. During the years 1968 through 1971 respectively, the following approximate number of tires were manufactured by the five defendants combined: 1968—213,000; 1969—187,000; 1970—202,000; 1971—194,000. Substantially all of these SMC tires were marketed incident to lease agreements with transit companies.[10] For the years 1968 through 1971, the following number of lease agreements were in effect with separate transit companies: 1968—667; 1969—673; 1970—675, and 1971—674. During 1973, transit companies operating under lease agreements with one of the defendants varied in size of operation from a minimum of 3 or 4 buses to a maximum of approximately 2,500 to 3,000 buses.[11]

Each transit operation which leases SMC tires from one of the defendants has an individual lease agreement. The lease agreement may result from negotiation between the transit company and SMC tire supplier, or may be the result of a formal bid request issued by the transit company. Additionally, some transit companies request price or rate quotations from SMC tire suppliers without the issuance of formal bid requests. Since inception of the leasing practices,

---

8. Tire mileage and bus mileage differ little in reality. "Tire mileage" denotes actual mileage obtained on a particular tire, while "bus mileage" denotes that mileage which is traveled by a particular transit vehicle. By simple calculations, based on the number of tires on a bus, bus mileage may be converted to average tire mileage and vice versa.

9. The number of miles which must be obtained in order for the reduced bonus mileage rate to be applicable to additional miles obtained may vary from lease to lease and from tire to tire within a particular lease. The specific amount of mileage which must be obtained in order to commence the application of the bonus

rate is that mileage usually evaluated by the supplier to be the expected life of the particular type of tire under the particular circumstances of use.

10. From January 1, 1968, until June 29, 1971, the following approximate numbers of SCM tires were marketed to transit companies by methods not incident to leases: 1968–20; 1969–25; 1970–143; 1971 to June 29th–53. These figures do not include sales of special mileage tires under a purchase clause in a lease.

11. The leases introduced in evidence indicate that these 1973 figures are approximately the same as those for the prior three years.

it has been the general practice for the supplier to bill the lessee on a monthly basis for the tire or bus mileage actually run by the lessee at the rate established by the lease agreement. Lease agreements do not specify that the supplier shall furnish "special mileage commercial tires", but merely that "tires" are to be supplied. Generally it is the function of the supplier to decide which type of tire shall be supplied and to recommend that a particular type of tire supplied shall be utilized in a particular phase of the lessee's transit operation.

In 1969, the Federal Trade Commission initiated an investigation of the defendants' practices in regard to the marketing of special mileage commercial tires. Following the return of a Federal Trade Commission complaint the proceedings were terminated by the entry of a consent order which required the defendants to include specified clauses in their transit tire lease agreements and to perform and refrain from performing specified acts in connection with the marketing of SMC tires. Similar to the Federal Trade Commission proceedings, the complaints which plaintiffs herein assert relate primarily to alleged practices relating to the marketing of special mileage commercial tires. Apparently, due to the fact that the great majority of SMC tires manufactured since their development have been marketed incident to leasing arrangements, plaintiffs herein seeking to represent the class have attempted to establish the similarity of all leases in support of their contention that their actions should be maintained as class actions under the provisions of Rule 23(b)(3) of the Federal Rules of Civil Procedure.

The Court has examined the approximately 1400 transit tire lease agreements offered in evidence by plaintiffs. And, although these agreements between potential class members and one or more of the defendants vary substantially as to form, length, terminology, and detail, they do, with few exceptions, contain strikingly similar provisions relating to the amount of the lessee's tire requirements which will be supplied, and to the disposition of tires in the lessee's possession upon expiration of the agreement. Cutting through the innumerable differences and variations in form, detail and terminology in the agreements, it is evident that the great majority of the lessees of transit tires have been party to an agreement with one or more of the defendants which contained in substance three of the provisions which plaintiffs' assert to be pertinent to their federal antitrust claims. Of the approximately fourteen hundred lease agreements introduced in evidence, approximately 775 were in effect during the period from January 1, 1968 to June 29, 1971. With the exception of approximately 25 of the 775 agreements, all provide in substance the following general terms relating to the amount of the lessee's requirements for tires to be supplied, and the disposition of tires in the lessee's possession upon expiration of the agreement: (1) that the lessee obtain all or substantially all of its transit tire requirements from the lessor during the term of the agreement;[12] (2) that new or additional vehicles acquired by the lessee during the term of the agreement be equipped with the lessor's tires and included under the existing agreement; and (3) that upon the expiration of the agreement, unless a new agreement is entered into, the lessee shall purchase or arrange for the purchase of all or substantially all of the lessor's

12. The usual exception to the requirement that the lessee obtain all of its tire requirements from the lessor is a provision which permits the lessee to equip a percentage of its vehicles or obtain a percentage of its tire requirements from another source. This exception is normally provided to allow the lessee to "experiment" with different types or brands of tires, and in most cases may not exceed 5% of the lessee's vehicles or tire requirements.

tires in possession of the lessee at a price to be determined by a formula provided in the agreement.[13]

It is plaintiffs' primary contention in support of their class action requests that the issues of conspiracy presented by their pleadings coupled with the mentioned similar provisions in the lease agreements present questions of law and fact common to the proposed class which predominate over any questions which affect only individual class members. On this basis they argue that class action is the superior method for the fair adjudication of the controversy.

## CONCLUSIONS OF LAW

In order to satisfy the requirements of Rule 23, F.R.Civ.P., the plaintiffs herein seeking to act as class representative must establish the following:

"(1) The class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

And, it is required that:

"(T)he court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to any other available methods for the fair and efficient adjudication of the controversy."

The matters pertinent to that finding by the Court include:

"(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

The Court's review of the entire record of the evidence offered and received at the hearing on plaintiffs' class action request in light of the briefs submitted by the parties and the applicable law convinces that these actions are not proper for class action proceedings under Rule 23(b)(3) of the Federal Rules of Civil Procedure.[14] The reasons upon which this determination is based are many and complex. However, the primary consideration affecting the Court's determination is the fact that these cases present questions of fact which pertain to and affect only the individual class members and which predominate over the questions of law and fact which are common to the class.

Because of the lack of predominance of the common issues of law and fact, the Court is of the opinion that class action proceedings are inferior to other available methods for the fair and efficient adjudication of the numerous claims, and the Court is convinced that the presence of the individual issues of

13. The formula to be applied under the agreement to determine the amount which will be paid for tires which the lessee may be obligated to purchase upon the expiration of the agreement may be affected by the number, type, size, and use of the tires, and by other factors relating to the lessee's transit operation. Therefore, the applicable formula may vary from lease to lease.

14. The findings of the Court reflect the Court's rulings on the evidentiary objections asserted at the hearing and taken under advisement by the Court at close of the evidentiary hearing. Specifically, the Court has overruled defendants' objections to the plaintiffs' hearing exhibit No. 1001, and has sustained plaintiffs' objections to the affidavits offered by defendants. The Court has relied upon the contents of documentary exhibits and has disregarded the parties' evidence which purports to establish the contents of the documents.

fact and the nature of those issues would, if these actions were to proceed as a class action, interpose difficulties in the management of the litigation which could not be overcome. The nature of the individual issues of fact, the difficulties in management which the Court deems likely to be encountered, and the reasons for the Court's belief that a class action is not superior to other available methods of adjudication will be set forth in the remaining portions of this memorandum.[15]

██ In actions sought to be maintained as Rule 23(b)(3) class actions, the Court is required to find that questions common to the class predominate over questions affecting only individual class members. It is only where this predominance exists that economics can be achieved by means of the class action device. And, if there is present a likelihood that significant questions not only of damages but of liability and defenses to liability will arise affecting only individual members of the class in different ways, class action treatment is inappropriate. See, Advisory Committee Note of 1966 to Rule 23, F.R.Civ.P.; 3b Moore's Federal Practice, ¶ 23.01(10.–3), p. 23–29 (1974 ed.). Furthermore, if it appears that the class action would in practicality degenerate into multiple lawsuits, class action proceeding is inappropriate. 3b Moore's Federal Practice, ¶ 23.45(2), p. 23–755 (1974 ed.).

█ The determination of whether or not common questions of law or fact will "predominate" over issues affecting only individual members is not an easy task. Although text writers and some decisions speak in terms of a "common nucleus of operative facts" or a "common cause of action," see 3b Moore's, *supra* at page 23–754 to 23–756, these tests standing alone offer little, if any, guidance. Rather, the Court must look to the allegations of the complaints and the evidence presented in support of the factual class action allegations in making an appropriate determination. Even though it may be found that class members may have claims based on a common set of facts which may give rise to liability, it may be that defenses, damages, and the standards by which they are measured may differ substantially. For this reason, the Court must do more than consider the allegations of liability and the proof which may be offered on that issue.

██ Under Rule 23, even though the Court may find that common issues of law or fact predominate over individual issues, a class action may be inappropriate due to the fact that another method of handling the litigation may be available which has some practical advantages over the class action device. Advisory Committee Note of 1966 to Rule 23, F.R.Civ.P.; 3b Moore's Federal Practice, ¶ 23.01(10.–3), p. 23.30 (1974 ed.). In determining the question of "superiority", factors (A) through (D) of Rule 23(b)(3) are pertinent, but not exhaustive. See, Advisory Committee Note, *supra.*

---

15. Because the Court's determination of the class action issues rests primarily on the plaintiffs' failure to establish the requirements of Rule 23(b)(3), F.R.Civ.P., the Court will not discuss the evidence or findings relating to the requirements of Rule 23(a) in the text of the Memorandum. The Court notes that the evidence presented supports the findings that (1) the class is so numerous that joinder of all members is impracticable, (2) that there are some questions of law or fact common to the class, and (3) that the claims of at least one of the representative parties are typical of at least some of the members of the class.

Because some of the proposed representative parties were party to a transit tire lease agreement which resulted from a bid request issued by that party, it is questionable that these representatives' claims are typical of the claims of class members who were party to agreements which resulted from negotiations. The Court does not find that the representative parties claims are not typical, but merely notes that plaintiffs' evidence does not totally resolve the question. The Court makes no observation or finding on the question of whether the representative parties would fairly and adequately protect the interests of the class.

*The Question of "Predominance"*

The instant litigation does not fit into the category of the "antitrust model" where all legal and factual issues relating to liability are uniformly related to all those allegedly harmed. See, 3b Moore's *supra* at p. 23–759. In this litigation, neither the products involved nor the purchasers are standardized. Rather, the class includes different sizes of transit companies, operating under different conditions throughout the United States, and the products involved, although commonly referred to as "Special Mileage Commercial Tires", differ in many respects and have been marketed under various arrangements which were reached by different methods at different times.

■ The claims which are asserted by plaintiffs on their own behalf and on behalf of the proposed class charge that the defendants have refused to sell or market tires except on specified terms and have required that plaintiffs and class members accept certain conditions in conjunction with the marketing of tires. Because of the numerous differences which may have arisen in the dealings between class members and one or more of the defendants, it is unlikely that plaintiffs can establish these allegations by facts which are common to all class members. Proof of the factual allegations of the complaints concerning violation and injury will necessarily vary from transit company to transit company, as it does not necessarily follow that proof of the factual allegations as to one plaintiff will establish that fact as to other plaintiffs and class members.[16] Because of the presence of five different defendants, approximately 1400 leasing arrangements, and a period of time of at least twenty years, it is possible that the defendants may not have acted uniformly with respect to all class members. In addition to the individual issues of fact which are likely to arise on proof of liability on behalf of the class, it is clear from the pleadings in these suits that defendants will attempt to establish various facts in defense of the claims which pertain only to individual class members. In determining whether common issues of law or fact predominate, the Court cannot ignore the issues of fact which are likely to arise in defense of the class claims, and the Court cannot assume that these defendants will waive their opportunity to attempt to discover and present evidence relating to their dealings with the individual class members. A realistic view of this litigation discloses that the defendants will attempt to establish that the individual class members did not request or attempt to obtain the items and services which they are alleged to have refused to provide, and they will attempt to establish that the terms of the individual leases which form the factual basis of the complaints were in fact requested by the individual plaintiff or class member. It is not unreasonable to anticipate that the defendants will attempt to establish that a large number of the leasing arrangements were entered into on the basis of a class member's bid request, and that the defendants will attempt to elicit the facts surrounding the issuance of the bid request and the refusal or acceptance of a particular transit company's bid request. In summary, the files, records, and evidence received in these suits discloses that the determination of the issue of liability alone would more than likely involve significantly different evidence and factual determinations as to each of the approximately 750 class members.

■ Plaintiffs' argument that the common questions of law and fact herein are the questions going to the alleged conspiracy to restrain trade, lessen

---

16. For example, the complaints allege that defendants "padded" inventories prior to the expiration of lease agreements to force a renewal of the lease by increasing "buy out" costs. This allegation obviously entails proof of an individual nature.

competition, to attempt to monopolize and to monopolize ignores the proper determinations which must be made on a request to maintain a Rule 23(b)(3) class action. Rule 23 requires more than a consideration of commonality in the ultimate questions of law or fact; it requires close consideration of the separate questions of law or fact which determine those ultimate issues. Due to the fact that plaintiffs claim only damages on behalf of the class and there is no request for injunctive or declaratory relief, the gravamen of this litigation is the question of whether or not the plaintiffs and class member were injured by any actions of the defendants. Whether "injury" is viewed as an element of proof of "liability" or as a separate issue, the fact remains that proof relating to injury and proof in defense of the claims of injury will involve individual issues of fact.

In addition to the individual questions which are likely to arise on the issue of liability, plaintiffs have alleged that the defendants have fraudulently concealed the alleged violations since the inception of the alleged illegal practices—about 1930—in an attempt to escape the applicable four year statute of limitations. Therefore, plaintiffs will apparently offer evidence to establish that the class members remained in ignorance of the facts disclosing the existence of a cause of action through no fault of their own. This proof will more than likely involve much evidence which pertains only to individual class members, and it may bring about evidence on behalf of the defendants in their attempt to establish that the individual class members were not unaware of the basic facts disclosing their cause of action, or if so, it was through their own fault.

For the reasons which will be elicited in the portion of this Memorandum relating to manageability, the Court is convinced that proof of damages in this litigation will be of an individual nature, and that plaintiffs or individual class members would be required to adduce evidence to establish monetary damages to each individual class member. Plaintiffs contend that the issue of the amount of damage can be separated from proof of "liability" (or violation and injury), and that under the provisions of Rule 23(c)(4) these actions may be maintained as class actions with respect to the issues of liability. It is asserted that if liability (and injury) is established, the class members may thereafter prove the amounts of their respective individual claims. See, Advisory Committee Note of 1966 to Rule 23(c)(4), F.R.Civ.P.

Although the idea of severability of the individual class members' proof of damages from the class action proof of liability may be workable when the class of plaintiffs is a small, closely knit group which is confined to a relatively compact geographic area, this Court questions the idea when it is applied to a large class of plaintiffs who are scattered throughout the United States. In the context of this litigation, plaintiffs' proposal of severability would necessitate the appearance of approximately 750 class members in the Court in which the class action on liability is litigated. Apart from the question of the manageability of such a proceeding, unless the issues of liability and damages can be fully separated, the individual trials on damages may bring about evidence on defense of the individual "damage" claims which relate to the issues of liability or injury to the particular class member. Although this possibility may not dictate against separate class action treatment of the liability claims of a relatively small, closely knit class of plaintiffs when it appears that the issues can be separated, it takes on considerable importance in a class action of the size and type proposed herein. In the instant litigation it is not at all clear that the issues of "liability" and damages can be fully separated so that a successful class action as to "liability only" will

resolve all issues but the amount of monetary damage each class member is entitled to. And, even if it could be said to a reasonable certainty that such separation was possible, this Court questions the interests of judicial economy and the superiority of a class action which requires all of the class members to enter an appearance and establish the amount of their monetary damage in a court which may be thousands of miles from their place of business. When the benefits of a class determination of violation and possibly injury are weighed against the expenses which the class members must incur by litigation in a distant forum, the inconvenience to the parties and witnesses, the administrative problems involved, and the problems of notice to the class members, the resulting balance reveals that the class action device offers no superiority over the individual litigation of claims. When there exists a substantial possibility that individual questions relating to injury will also be litigated in the individual "damage" trials, the lack of superiority of the class action device becomes clearer.

For the reasons stated, the Court finds that the issues of law and fact common to the class alleged herein do not predominate over the issues which may affect only individual class members. Plaintiffs' proposal for a class declaration on the issues of "liability only", even if accepted, does not alter this finding for the reason that on the issues of liability, including injury, common questions do not predominate within the meaning of Rule 23(b)(3). In reaching this conclusion, the Court has assumed that plaintiffs are serious in the factual allegations of their complaints, that defendants will vigorously defend the claims as they have done thus far, and that these actions will eventually proceed to trial.

### The Question of "Superiority"

Notwithstanding the Court's determination on the issue of predomi-nance, the Court deems it advisable to discuss the reasons for its belief that the class action device is not superior to other available methods for the fair and efficient adjudication of the controversy.

The difficulties of management which are likely to be encountered if the alleged class action were allowed relate primarily to the required individual proof of damages. If a class action were permitted, and assuming *arguendo* that plaintiffs can establish the elements necessary for the submission of the issues pertaining to violation of the federal antitrust laws by operative facts which are common to the class, that evidence would constitute only the initial step in a trial of the class action complaints. Assuming the representative parties brought forth evidence common to the class members which would make a submissible case on a "per-se" violation of the federal antitrust laws, the question of impact or fact of injury to class members would likely necessitate proof of an individual nature. In any event, it is abundantly clear under the facts presented to the Court that proof of the amount of monetary damage to each of the class members would require individual proof by or on behalf of each individual class member. Because of the nature of the product involved and the method of marketing which is alleged to form the basis of the claims, proof of damages will not be a simple matter of calculation, but rather will involve numerous calculations pertaining to the individual class members, and is likely to require substantial expert testimony.

The evidence received by the Court discloses that the measure of damages under the claims asserted by plaintiffs is the difference between the rate actually paid by the transit companies for the use of transit vehicle tires and the rate which would have been paid for the use of a particular tire during the same period of time at a competitive price level. Plaintiffs contend that the measure of

damages can be easily computed by a formula applicable to all class members and that therefore the individual proof of damages will not necessitate the appearance of each individual class member and can be simply presented by the representative parties from evidence to be obtained from defendants. In support of this contention, plaintiffs assert that the actual "cost per tire" to a particular class member can be computed by multiplication of the tire's obtained mileage by the rate per mile paid by the lessee for the use of the tire. It is asserted that the amount of monetary damage incurred by a class member may then be determined by computation of the difference between this "cost per tire" and an "inventory value" which plaintiffs assert is assigned to each tire marketed by defendants. Plaintiffs contend that the difference between "cost per tire" and "inventory value" can be computed as to each lease and that this difference represents a minimum measure of damages for each lease to which a class member was a party.

From the evidence which has been adduced in these proceedings, it can only be said that plaintiffs' proposed theory of damage computation ignores reality. Initially, assuming the proposed "cost per tire" figure could be utilized as an element of the damage computation, its computation would involve much more than simply the multiplication of rate per mile times number of miles run. Many of the lease agreements contain rates "per bus mile" as opposed to "per tire mile" and therefore rate per tire mile can only be determined to an average figure, keeping in mind that there are different types of tires used in different circumstances on different types of buses and there may be different types of tires used on the same bus. Furthermore, the rates per bus mile or per tire mile in many of the tire lease agreements include charges for tire service to be rendered by the lessor, and many of the

rates paid were under the "bonus mileage" rates. Any computation of "cost per tire" under plaintiffs' proposed theory of computation would necessarily require adjustment for service charges included in the rate, and each tire which achieved bonus mileage would require a separate computation for that mileage. Additionally, the "cost per tire" must be calculated for each *tire* leased, and the computed cost would in all likelihood differ to some degree from tire to tire, even though the tires for which the cost is computed may be identical and were used by the same transit company at the same time. In addition to these reasons, plaintiffs' proposed "cost per tire" calculation does not take into consideration that the class member transit companies did not *buy* SMC tires but rather *leased* tires or purchased mileage on tires. Obviously, the amount paid for the use of an item over a period of time will not necessarily be the same as the purchase price for the same item at the time the lease was entered into. Such factors as risk of loss, benefits of extended payment periods, costs of lessee supervision, and the value of the leased item at the end of the lease period enter into a lease rate. These factors may cause the amount paid for the use of an item to be higher or lower than that which would be paid to purchase the item, depending on the terms of the lease and the duties and responsibilities assumed by the parties. Because of the nature of transit vehicle tires and the previously mentioned factors which may affect their life and wear, the amount paid by tire lessees for the use of tires differs from time to time, from tire to tire, and from place to place. In view of the effects of these factors, and the differences in the terms of the various lease agreements, it is apparent that plaintiffs' "cost per tire" computation cannot properly be utilized in the computation of damages, as the computation attempts to equate the leasing of tires to the pur-

chase of tires and ignores the differences between the two methods of marketing.

Assuming that the above mentioned variables could in some manner be accounted for in reaching plaintiff's "cost per tire" figure, and that such a figure could be arrived at for the purpose of a damage computation, the problem that next presents itself is plaintiffs' proposed figure of "inventory value." Plaintiffs' have presented absolutely no evidence which would sustain their implied proposition that an "inventory value" allegedly assigned to tires by the defendants has any relation whatsoever to the "cost per tire" at a competitive price level. Plaintiffs' evidence relating to the referred to "inventory value" establishes that defendant Uniroyal maintains a "remaining inventory value" within its accounting and control division which relates to active tires which happen to be in the inventory of a particular lessee, and that defendant General Tire maintains an inventory of tires in the possession of lessees which have a "book value" assigned to them by accounting personnel. Their evidence establishes that in its complaint, the Federal Trade Commission alleged that the defendants valued and priced SMC tires under "buy out" requirements by methods or formulae which produced a "buy out" purchase price in excess of the manufacturer's "inventory value" for the tires bought. There is absolutely no evidence before the Court which establishes that Goodyear, Goodrich or Firestone maintain an "inventory value" or book value for any leased tires, or that *any* of the defendants maintain an "inventory value" for unused tires; or that if such a value has been assigned by any defendant, what value has been assigned to any particular tire. Notably, the Federal Trade Commission complaint does not allege or imply that the defendants maintain an inventory value on all tires or on new or unused tires, but merely alleges that "inventory values" have been assigned to tires which were purchased under a "buy out" arrangement. Needless to say, merely because a fact has been alleged in a complaint brought by the Federal Trade Commission, does not establish that allegation as true.

Because the measure of damages under plaintiffs' claims is the difference between the price paid and the price which would have been paid at a competitive price level, unless some method for determination of the competitive price level is arrived at, damages cannot be computed. Plaintiffs have obviously attempted to arrive at a competitive price level by their introduction of the concept of "inventory value". However, for the reasons previously stated, the Court is convinced that it is total speculation to find that such a figure, if it exists, would, upon the trial of these claims relate in any way to the competitive price level for SMC Tires. Absent some method of arriving at a competitive price level which would apply to all of the proposed class members and which would allow proof of damages on a broad scale, the competitive price level under plaintiffs' claims would require proof by way of expert testimony.

Whether damages are computed on a "cost per tire" or "rate per mile" basis, for the reasons previously stated, it is abundantly clear that the amount paid by tire lessees for the use of tires differs from time to time, from tire to tire, and from place to place. It is likewise abundantly clear that the competitive price level for the use of SMC tires, assuming that it differs from the amount actually paid, difers from tire to tire, time to time, and place to place. Because of the extended period of time for which plaintiffs claim damage to the class, the size of the class, the fact that the proposed class is scattered throughout the United States, the differences in sizes

and types of tires involved, the conditions which may affect the life of a tire, and the literally millions of tires upon which plaintiffs and class members propose to claim damages, it becomes readily apparent that this action is not proper for class action maintenance. Under the circumstances, proof of damages would require that the plaintiffs establish the actual amount paid for the use of a particular tire and then establish by expert testimony what the use of that particular tire at that time and place under the same conditions would have cost on a competitive price level. If, through the use of electronic computers or calculators, plaintiffs could make and present in a manageable form the literally millions of calculations necessary to establish the amount paid for the use of tires by each class member, and assuming that plaintiffs could produce an expert who could qualify to give the expert opinions necessary to establish the competitive price levels for the use of each particular type of tire under similar operating conditions, the time and complexity would reach proportions so as to make the class action totally unmanageable. Furthermore, it is not realistic to assume that such calculations can be made and presented in a simple and manageable form, or to assume that one expert could qualify to give the opinions concerning the competitive price level of millions of tires marketed throughout the United States over a period of approximately forty years.[17]

17. When it is understood that identical tires will not attain the same mileage when operated under different conditions, and that a transit company in most circumstances operates vehicles under varying conditions, it becomes evident that when the competitive price level is expressed in terms of a fair amount which would be paid for the *use* of a tire, that level will, with few exceptions, differ among the particular tires supplied to the same transit company even though the tires were in use during the same period of time. Identical tires produced at the same time will likely have an equal cost to the manufacturer. However, due to conditions of use the identical tires are unlikely to attain the same mileage during the life of the tire, even though used by one transit company at the same time. Therefore the competitive price level to be paid for the *use* of any tire leased is directly related to the conditions of use and the mileage which the tire can be expected to attain while in use.

Using the tires marketed to plaintiff City of Cleveland Transit Division alone as an example, the complexity and the extent of the evidence necessary to establish damage to an individual class member becomes evident. During the period from January 1, 1967 to December 31, 1967, City of Cleveland Transit Division was supplied with approximately 6391 SMC tires of at least four different sizes and various types. These tires were utilized under various conditions which affect wear and mileage attained in varying degrees. The rates paid during this one year period varied from $.00695 per "vehicle mile" for new tires to $.0059 per "vehicle mile" for recap or retread or recap tires. These rates were subject to a bonus of a 50% deduction for mileage in excess of 100,000 miles on new tires and in excess of 40,000 miles on recap or retread tires, and the rate per vehicle mile included a charge for servicing tires and tubes. The rates per vehicle mile during the year 1967 were subject to escalator provisions according to specified market prices for rubber and rayon, and Cleveland Transit Division was permitted to regroove smooth tires at its own expense.

For the year 1967 alone, plaintiff Cleveland Transit Division will be required to establish the rate or price paid for the use of each of the approximately 6391 SMC tires supplied to it, and these calculations will necessarily include factors for service, bonus mileage, recap or retread tires, and escalator provisions.

In order to arrive at a damage figure, the expert will necessarily be required to establish the competitive price level for the use of each of the approximately 6391 SMC tires supplied in the year 1967. The expert testimony necessary to establish a competitive price level for each of the tires supplied will, to say the least, be lengthy. Assuming a level cost of labor, materials, shipping, and other factors which may affect the competitive price level, the expert will be faced with the problem of establishing the competitive price level for the *use* of a particular tire under the particular conditions which the particular tire was in fact used. Due to the various

Because proof of the amount of monetary damages in this litigation is an issue which relates to each of the individual class members, because there does not appear to be an available method of proof of damages which is common to the class, and because of the complexity of the individual proof of damages, the Court is convinced proof of damages by or on behalf of the approximately 750 class members would create a situation which would be totally unmanageable. In reaching this conclusion, the Court is not unmindful of the fact that under normal circumstances defendants in antitrust litigation do not ordinarily decline to exercise their right of cross-examination on the issue of damages and do not ordinarily decline the opportunity to challenge the plaintiff's expert testimony on the issue of competitive price levels. Because the Court has allowed extensive discovery on the class action issues in this litigation and has received a large volume of evidence in the evidentiary hearing on the class action issues, the facts pertaining to the potential management problems in this litigation have been fully developed. For that reason, the Court declines to follow the path of declaring a class action with the possibility of reviewing the management problems at a later date. See Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 567 (2nd Cir. 1968).

Although it may be said the interests of judicial economy are better served if all similar litigation is concentrated in one forum and that therefore the tremendous administrative burden and management problems which would be created by the proof of damages in this litigation should not dictate against maintenance of a class action, it is a fact of life that at some point the administrative burden and management problems overwhelm the Court which may have taken on class action litigation without adequate consideration of those factors. General statements regarding "judicial economy" without regard to the limits of the particular court upon which the burden of this "economy" is placed are meaningless. Plaintiffs herein have not made any proposals of smaller classes or of sub-classes, and it appears that they have taken an "all or nothing" stance on their class action bid. This Court will not take it upon itself to determine possibilities for reduction in class size so as to relieve the problems of administration and management as none of the representative parties have indicated a willingness to represent a smaller class. Furthermore, the problems of the lack of "predominance" of the common issues would remain in the smaller class or classes. See, e. g. Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa.1968).

In addition to the problems in management, there are other factors in this litigation which strike against the alleged superiority of the proposed class action. Initially, it should be observed that there does exist an alternative meth-

---

and numerous factors which may affect tire wear, it is probable that the competitive price level for the *use* of a particular tire will differ depending on the particular use to which the tire was put. For example the competitive price level expressed in cents per tire or vehicle mile for the use of an 11.00 x 20 intercity type SMC tire on a vehicle making frequent starts and stops and likely to strike curbs would differ from the competitive price level for the use of the same size and type of tire on a vehicle operating in a different area of the transit company's area under dif-

ferent conditions. This difference is due to the established facts that SMC tires achieve different mileage under different conditions of use and the probability that the costs of manufacture and supply of the same size and type of tires would remain the same. It is totally unrealistic to assume that a tire manufacturer who supplies two identical tires on the same rate per mile basis receives the same return from the lessee on each tire supplied when one of the tires supplied achieves 10,000 miles and the other achieves 100,000 miles.

od available for the handling of at least the preliminary proceedings in the litigation other than the class action device. Because these actions have been consolidated in this Court for all pretrial proceedings under the provisions of Title 28, United States Code, Section 1407, and it can be expected that other individual actions will be transferred to this Court under the provisions of that Section, the pretrial proceedings in all of the individual actions can be consolidated and coordinated. Thus, denial of the class action requests will not result in repetitious discovery or duplication of pretrial procedures by the various individual plaintiffs. Possibly, the issues to be presented in the trial of the individual complaints will be substantially narrowed by these coordinated pretrial procedures. Under the procedures outlined in the Manual for Complex Litigation, the individual actions can be processed as a package through the use of liaison counsel and pretrial procedures can be utilized to narrow the issues and prepare the individual cases for trial. By this method, the interests of judicial economy can be served and the problems of administration and management which would be created by a trial of the class action can be avoided.

It also deserves mention that a large number of the transit companies which are alleged to be members of the class appear to have potential claims against one or more of the defendants which are not insubstantial, thus removing this litigation from the class of case which supports maintenance of the class action on the basis that the individual claims will not support the costs of prosecution. Furthermore, some of the class members appear to have a genuine desire in prosecuting their individual claims. All three of the plaintiffs who are seeking to represent the class have expressed a desire to control the prosecution of the class action, and none of these three

has expressed a desire to be represented by one of the other parties seeking to act as class representative. There are presently pending in these five consolidated cases approximately 15 petitions to intervene as plaintiffs. These petitions, and the fact that the California plaintiffs have expressed a desire to prosecute their actions separately from any class action, indicate that some of the class members are interested in prosecuting their own claims. The existence of these parallel suits indicates that some of the class members do have potential claims which they deem to be worth the costs of individual prosecution, and were a class action to be declared, there still would exist a real possibility of multiple litigation.

The Court is not unmindful of the judicial economy which can be gained by the proper application of Rule 23 of the Federal Rules of Civil Procedure. However, the application of Rule 23 to this litigation without regard to the numerous individual issues of fact which are likely to arise, and without regard to the tremendous administrative and management problems which will inevitably arise is not in the interests of judicial economy or in the interests of justice. A declaration of the class action requested by plaintiffs would not result in the fair and efficient adjudication of the controversy so far as the individual class members are concerned, but instead would bury their potential cause of action under the weight of evidence pertaining to the claims of other class members. There does not appear from the evidence presented to be available any method of management which could be utilized to render the proposed class action superior to other available methods of adjudication. See, e. g. In re Antibiotic Antitrust Actions, 333 F.Supp. 278 (S.D.N.Y.1971). And, this Court is of the opinion that, in view of the extensive facts which have been developed

herein, it would be misleading to the class members to declare a "conditional class action" under the provisions of Rule 23(c)(1). The representative parties herein, with the benefit of extensive discovery and the opportunity to offer all evidence which they deemed relevant to the Rule 23 issues, have failed to establish that common questions of law or fact predominate over questions affecting only individual class members and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy. There is no reason to believe that the problems which the Court has attempted to disclose in this Memorandum will in some manner disappear with the passage of time or with a "conditional" declaration that these actions shall proceed as a class action.

Based on all of the foregoing, the Court finds that none of the parties seeking to represent a class of plaintiffs has presented evidence which would justify the maintenance of the class action alleged. Accordingly,

It is hereby ordered:

1. That the motions of plaintiffs City of Cleveland Transit Division, Dade County, Florida, and D. L. Brenner, et al., for order determining a class action as alleged in the complaints of those plaintiffs are denied.

2. That the motions of the defendants that Civil Actions numbered 20688-4, 20689-4, and 20411-4 not be maintained as class actions under the provisions of Rule 23 of the Federal Rules of Civil Procedure are sustained.

3. That the allegations of class action are stricken from the complaints filed by the city of Cleveland Transit Division, No. 20688-4, by Dade County, Florida, No. 20689-4, and by D. L. Brenner, et al., No. 20411-4.