**Richard PLEKOWSKI, Plaintiff,**

v.

**RALSTON PURINA COMPANY, Defendant.**

**Civ. A. No. 2909.**

United States District Court, M. D. Georgia, Macon Division.

July 11, 1975.

F. Kennedy Hall, Hall & Bloch, Macon, Ga., and Emmet J. Bondurant, II, Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for plaintiff.

John D. Comer, Sell, Comer & Popper, Macon, Ga., and Gordon F. Hampton, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for defendant.

## OPINION AND ORDER ON PLAINTIFF'S MOTION FOR CLASS DETERMINATION

ELLIOTT, Chief Judge.

This matter is presently before the Court on the plaintiff's motion for class determination pursuant to Rule 23(c)(1) F.R.C.P. After full consideration of the extensive briefs and substantial evidentiary record, the Court has determined for a number of reasons that the pending motion must be denied. In accordance with *Eisen v. Carlisle & Jacquelin*, 417

U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), this decision is not an inquiry into the merits of the suit; the merits of the named plaintiff's case are not the subject of this opinion. For the purpose of this motion the Court makes findings and determinations as set forth below.

In this treble damage action the plaintiff alleges tying arrangements in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 3 of the Clayton Act (15 U.S.C. § 14). Jurisdiction rests upon Section 4 of the Clayton Act (15 U.S.C. § 15). Under Rule 23 F.R.C.P. the plaintiff seeks to bring this action not only individually, but as a representative of a class alleged to consist of all persons who obtained loans or credit from the defendant, any portion of which was outstanding during the four-year period immediately preceding the filing of the complaint; who purchased feeds from the defendant during the period; and who were parties to written agreements with the defendant containing a provision on the part of the purchaser to use the defendant's livestock and poultry feed products in his own feeding operations exclusively so long as any indebtedness of such person was outstanding or so long as such person was party to an agreement with the defendant authorizing the defendant to declare all obligations due and payable if the purchaser procured feed from suppliers other than the defendant.

The tying arrangements attacked by the plaintiff may be divided into two broad categories. The first category consists of the tying of feed purchases to the advancement of loans primarily for the purchase of livestock and poultry or for the purchase of capital equipment. The second category consists of the tying of feed purchases to the deferral of payment for such purchases, i. e., the extension of credit for the feed purchases themselves.

The plaintiff's complaint alleges, and the record indicates, that the damages individually sustained by the plaintiff were substantial. He contends that, but for the tie, he could have bought equivalent feed elsewhere for a lower price. The defendant has asserted a counterclaim against the plaintiff individually on a promissory note and on an open account for the total amount of $75,052.63, and the plaintiff's complaint avers that his damages exceed "any indebtedness which may be lawfully due from plaintiff to defendant".

Substantial discovery, both formal and informal, has provided a sound factual background for the determination of this motion. The plaintiff was furnished by the defendant with numerous credit files for at least one customer from each of the defendant's 36 geographical areas of operation. In addition, a wide array of documentary material was furnished to the plaintiff by the defendant from defendant's headquarter offices. The parties obtained large numbers of representative feed price lists for various points in time from more than 30 livestock and poultry feed manufacturers located in various regions of the United States. The defendant also furnished the plaintiff with complete records of 62 customers out of the more than 6,500 of the defendant's customers, past and present, which the plaintiff seeks to certify as a class. This latter phase of the document production amounted to some 95 file drawers of material.

The plaintiff furnished to the defendant many documents including the plaintiff's financial records and records of agricultural operations. Depositions have been taken and a number of documents were produced at the proceedings which are attached to each of the four depositions. The plaintiff deposed three officials of the defendant, and the defendant deposed the plaintiff. Substantial evidentiary materials have been appended to the briefs filed with the Court, and affidavits and offers of proof have been submitted.

The plaintiff a resident of Crawford County, Georgia, entered the business of

raising hens for commercial egg production in June, 1969, and continued until the end of 1971. In early 1969 he purchased land and erected egg production facilities through financial assistance obtained from the Central Georgia Production Credit Association (PCA). He purchased started pullets (hens in the beginning stage of egg production) in part through funds made available by the defendant. During the pertinent period, the plaintiff also puchased laying hens with the proceeds of loans from the Crawford County Bank and the Central Georgia PCA. To secure loans from the defendant, the plaintiff executed security agreements. Some of these security agreements, at least, cóntained language challenged by the plaintiff as tying the loan to the purchase of poultry feed supplied by the defendant. Except for a few purchases from other suppliers, the plaintiff purchased poultry feed only from the defendant during the period he was indebted to the defendant.

The defendant is a Missouri corporation with headquarters in St. Louis. Nationally, the defendant is the largest manufacturer and distributor of feed for livestock and poultry. However, the defendant's share of the feed market varies from area to area and there are many manufacturers and distributors whose market share exceeds that of the defendant in given areas.

The feeds manufactured by the defendant are sold primarily through a network of independent dealers with some additional direct sales to feeders. The defendant sells its feeds for cash, on short-term credit, and in limited cases on extended credit. Credit terms do not affect the price which the customer pays.

Short-term credit sales are made on normal "2%-7, net 30 day" terms. Extended credit terms vary according to the needs of particular customers. Payments for most of the defendant's feed sales are made within 30 days. For approximately four years preceding the filing of the plaintiff's complaint, less than ten percent of the defendant's feed sales were made on extended credit terms. On some occasions the defendant has advanced funds to customers to assist them in various agricultural activities or for expansion of their physical facilities. The defendant employed many different forms of agreements, many with diverse provisions, to evidence its financing arrangements, some 40 of which plaintiff now attacks.[1]

In 1969 the defendant changed the form of security agreement to eliminate the provision which the plaintiff attacks. However, in the field, where the forms were used the old forms became mixed with the new forms; thus, the use of the old forms continued on an intermittent basis.

Other facts will be discussed throughout this opinion.

■ It is well established that the burden rests upon the plaintiff to bring this case within the requirements of Rule 23. As we stated in *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463 (10 Cir. 1974):

"For an action to be maintained as a class action, a plaintiff must satisfy the four requirements of Rule 23(a) and any one of the three subdivisions of Rule 23(b) . . . The burden is upon the party requesting a class action to show that the several require-

---

1. For example, Paragraph 5 of the named plaintiff's security agreement provided as follows:

"5. Debtor agrees, so long as any balance remains due on any indebtedness secured hereby, to sell, deal in, and use in his own feeding operations Purina Chows exclusively; provided, that Debtor may sell, deal in, and use in his own feeding operations Check-R-Mix feeds, which are a mixture of Purina manufactured feed concentrates and grain. Failure of Debtor to comply with this provision, or discontinuance of Debtor, for any reason, as an authorized dealer of Secured Party, shall give Second Party the right to declare all obligations secured hereby immediately due and payable in full."

ments of Fed.R.Civ.P. 23 are satisfied."

The Court concludes that the plaintiff has failed to satisfy this burden.

The four prerequisites to a class action under subdivision (a) of Rule 23 will now be examined insofar as they apply to the pending motion.

The first prerequisite, that of numerosity, has been satisfied here.

We now turn to the second prerequisite of subdivision (a), the necessity that there must be questions of law or fact common to the purported class. This prerequisite overlaps with subdivision (b)(3) which requires the plaintiff to establish "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ." These two requirements of Rule 23 will be considered together, with principal focus upon the "predominance" requirement of subdivision (b)(3).

The undisputed facts, against which commonality must be measured, stand out in this case. The defendant uses some 50,000 different feed formulations in manufacturing more than 1,000 commercially distinct products at over 80 facilities. Comparison of these products with competitive feeds is difficult because the ultimate cost to the feeder depends upon not only unit price, but the ratio of conversion of feed into end products, e. g., into gallons of milk, pounds of meat, dozens of eggs, etc. This is often referred to as the "conversion ratio" or "efficiency" of the feed. The defendant's feed products are used by feeders of hogs, horses, cattle, dairy cows, sheep, mink, laying hens, broilers, turkeys, fish and virtually every other animal.

■■ The plaintiff asserts that the challenged clauses in the agreements are illegal tying arrangements. A tying arrangement is an agreement by a party to sell one product on the condition that a buyer also purchase a second product, or

at least that the buyer will not purchase the second product from any other supplier. Tying arrangements are unreasonable in and of themselves if a party has sufficient market power with respect to the tying product to restrain appreciably competition for the tied product and a not insubstantial amount of interstate commerce is affected. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The Court is convinced that the issue of whether the defendant has sufficient market power over the tying product is an individual, rather than a common, question.

In determining whether the defendant has sufficient market power over the tying product, it is important to note that defendant's customers, which consist of both dealers and feeders, have many sources for financial assistance other than the defendant. This assistance varies according to the needs and credit status of the customer. It also varies with the type of animal to be fed, the financial resources of the customer, and the credit market as it exists from place to place and from time to time. Sources for agricultural credit include local banks, private lenders, production credit associations, federal land banks, and numerous manufacturers and distributors of livestock and poultry feeds which are competitors of the defendant.

In these circumstances the issue of whether the defendant has sufficient market power would be an individual one for each customer were the case to be certified as a class action. Under the line of decisions stemming from *Fortner Enterprises, Inc. v. United States Steel Corporation*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), the finder of fact would have to determine as to each class member whether there were in fact alternative sources of credit available and, if so, whether the credit offered by the defendant was economically unique for each customer. Only then could it be determined whether the clauses could

be successfully challenged under the antitrust laws, for only then could it be determined whether the defendant possesses market power over the tying product as to each customer. *Fortner Enterprises, Inc. v. United States Steel Steel Corporation,* 452 F.2d 1095 (6 Cir. 1971); *Carlson Companies v. Sperry & Hutchinson Co.,* 374 F.Supp. 1080 (D. Minn. 1973); *Anderson v. Home Style Stores, Inc.,* 381 F.Supp. 402 (E.D.Pa. 1974). Under circumstances similar to the case at bar, the Court in *Carlson* stated (374 F.Supp. at 1087):

> "Thus it becomes apparent that the court in an economic uniqueness case must look to the economic ability of competitors to offer similar programs before an antitrust violation may be found. It would appear, therefore, that until there is an opportunity to assess the ability of a competitor to offer similar loans in a situation such as that before the Court, it would be impossible as a matter of law to hold that there was a violation of the antitrust laws. As in *Fortner,* where the Court left proof of questions of fact relating to a *per se* violation to trial, so here more evidence must be adduced before a determination may be made."

█ The plaintiff has argued at length that if the defendant has imposed the tie upon an appreciable number of customers then a finding of market power with respect to the class is required. This argument has been considered and rejected by other courts. As stated by the Sixth Circuit decision in *Fortner,* acceptance of the tie-in by an appreciable number of customers without more is not proof of market power sufficient to satisfy the *per se* test (452 F.2d at 1103). *Carlson* and *Anderson, supra,* both are decisions to the same effect. *Cf. Advance Business Systems and Supply Co., Inc. v. SCM Corp.,* 415 F.2d 55 (4 Cir. 1969). Thus, the requirement of market power must be considered to give rise to individual issues for class certification purposes.

In order for a tie to exist there must be two separate and distinct products. As stated before, here many of the challenged ties consist merely of extensions of credit for actual feed purchases while others consist of loans. A question which would arise is whether the delivery of feed on credit is anything more than a normal commercial sales transaction, in other words, whether the credit is ancillary to the sale and there are not two separate and distinct products. See *Washington Gas Light Company v. Virginia Electric & Power Company,* 438 F.2d 248 (4 Cir. 1971); *Polycast Technology Corp. v. Rohm & Haas Co.,* 305 A.2d 323 (Del.Supreme Ct. 1973); *Gas Light Company of Columbus v. Georgia Power Company,* 313 F.Supp. 860 (M.D. Ga.1970). The resolution of this problem would require an individual examination into each transaction.

Another individual liability issue arises under the question of causation. Section 4 of the Clayton Act permits private treble damage actions only by a "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." 15 U.S.C. § 15. A treble damage claimant can recover under this provision only where he has suffered an injury that was proximately caused by the alleged antitrust violation. This requirement, which has been referred to variously as "causation", "proximate cause", "burdensomeness", "impact", "injury" and "fact of damage", is an essential element of a treble damage claimant's liability showing in an antitrust case.

Each class member would have to demonstrate that "but for" the tie-in he could and would have purchased equivalent feed elsewhere at a lower price. Hence, if it were shown that a class member purchased feed from the defendant because he believed it to be the best product available for his purposes, or for any reason other than the alleged tie, he would have failed to establish the es-

sential causation element of his treble damage claim. This element of "proximate cause" is illustrated by the Supreme Court's decision in *Zenith v. Hazeltine*, 395 U.S. 100, 126–27, 128, 89 S. Ct. 1562, 1578, 23 L.Ed.2d 129 (1969), where the Court said:

"If Zenith's failure to enter the English market was attributable to its lack of desire, its limited production capabilities, or to other factors independent of HRI's unlawful conduct, Zenith would not have met its burden under § 4. . . .

" . . . [T]he question at hand is not whether, if Zenith had decided to enter the market, the pool would have been a deterrent and inflicted damage. Rather, it is whether Zenith was in fact constrained by the pool to stay out of England during the damage period or whether Zenith's own business calculus led it to await more favorable conditions."

Several courts have denied certification of classes, the denial being based, at least in part, on the fact that such proof of causation was an individual issue. *McMackin v. Schwinn Bicycle Co.*, 1974 Trade Cases ¶ 75,047 (N.D.Ill. 1973); *Shaw v. Mobil Oil Corp.*, 60 F.R.D. 566, 569 (D.N.H.1966). In *Shaw*, the Court stated:

"The proof of impact (fact of injury), the second prerequisite to recovery in private antitrust cases, will necessarily be different for each member."

The causation requirement cannot be overcome by the argument that, in some circumstances, a tying arrangement may constitute a *per se* violation of the antitrust laws. As was stated in *McMackin*, *supra* (1974 Trade Cases at p. 96, 690, n.4):

"In an attempt to avoid the necessity of proving the fact of damages, plaintiff argues that this is a *per se* case. There is no merit to this argument. The concept of per se violations was developed in response to cases holding that for purposes of § 1 of the Sherman Act, 15 U.S.C. § 1, certain restraints were of such a pernicious nature as to be held unreasonable without the necessity of inquiring into their actual effect upon competition. *The fact that an alleged violation is of a per se nature does not satisfy plaintiff's need to establish injury to his business or property as required by § 4 of the Clayton Act, 15 U.S.C. § 15.*" (Empasis added.)

In the case at bar each member of the class would have to show that "but for" the tying clauses he could have purchased equivalent products from another supplier at lower prices. This would necessitate proof of many facts—the type of product purchased, prices offered by alternative suppliers, whether the products and services offered by alternative suppliers were equivalent, etc.—which would necessarily vary from class member to class member. Accordingly, it is clear that proof of causation is an individual, rather than a common, question of fact and law.

In addition, the issue of proximate cause in tying cases necessarily raises the question of coercion. There is evidence here that customers were unaware of the tying clauses, and also that the defendant did not enforce them. In 1969 the defendant endeavored to abandon them. This distinguishes the present case from *Siegel v. Chicken Delight*, 271 F.Supp. 722 (N.D.Cal.1967), and similar cases where the defendants sought rulings that the challenged contractual provisions were enforceable.

■ As set forth in *Capital Temporaries, Inc. v. Olsten Corp.*, 506 F.2d 658 (2 Cir. 1974), in antitrust treble damage suits brought by allegedly tied purchasers, the weight of authority holds that proof of actual coercion "outside of the agreement" (506 F.2d at 661) must clearly be shown; it is insufficient to prove merely that the purchaser was

a party to a contract containing an alleged tying clause.[2] Also, this point is made clearly in another recent decision, *Landon v. Twentieth Century-Fox Film Corp.*, 384 F.Supp. 450 (S.D.N.Y.1974), where the Court, referring to *Capital Temporaries*, stated (384 F.Supp. at 457):

> "As the Second Circuit has recently stated, the *exercise* of actual coercion by the defendant (as distinguished from the mere presence of market power) is a necessary element of an unlawful tying arrangement." (Emphasis original.)

It is apparent that coercion is an important element of causation in tying cases. Whether the defendant has exercised unlawful coercion in its dealings with each class member raises purely individual questions, requiring separate trials. Whether class members were aware of the various clauses, whether any were influenced thereby, whether any attempted to negotiate a particular clause out of his agreement, whether any ever did or attempted to purchase elsewhere, and many other questions can only be determined on a customer-by-customer basis. This is what Rule 23 requires that we avoid.

In addition to the individual questions discussed above, the plaintiff is confronted with further individual problems of affirmative defenses and counterclaims. This is made clear in the case of *Transit Co. Tire Antitrust Litigation*, 67 F.R.D. 59 (W.D.Mo.1975):

> "It is only where this predominance exists that economics can be achieved by means of the class action device. And, if there is present a likelihood that significant questions not only of damages but of liability and defenses to liability will arise affecting only

individual members of the class in different ways, class action treatment is inappropriate. *See* Advisory Committee Note of 1966 to Rule 23, F.R. Civ.P.; 3b Moore's Federal Practice § 23.01 (10.–3), p. 23–29 (1974 ed.). Furthermore if it appears that the class action would in practicality degenerate into multiple lawsuits, class action proceeding is inappropriate."

The defendant's answer pleads the affirmative defense of release and accord and satisfaction as to many class members. In the instant case the Court is aware that there are several hundred class members who have executed releases of varying types in favor of the defendant. Many class members, for example, released all antitrust claims they might have arising out of their credit arrangements with the defendant. Should this case proceed as a class action these releases would be raised affirmatively by the defendant as a defense to the claims of many class members. The questions of whether a release has been executed, whether it is valid and whether it covers the subject matter of this lawsuit would require an analysis of each releasor's particular circumstances.

In *Abercrombie v. Lum's Inc.*, 345 F.Supp. 387 (S.D.Fla.1972), the plaintiff sought to maintain a class action in a suit alleging violations of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. The claim involved an alleged tying arrangement in franchise agreements with over 400 alleged class members. In denying class action status, the Court observed (345 F.Supp. at 393):

> "There were 127 general releases given over the course of the operations of Lum's when Lum bought back franchised stores. Plaintiff contends they

---

2. *Ungar v. Dunkin Donuts, Inc.*, 68 F.R.D. 65 (E.D.Pa.1975), held that individual coercion is not properly part of tying law, and stands against the clear weight of authority. The *Ungar* decision itself states that the doctrine of individual coercion in tying cases is "plainly in the ascendancy". 68 F.R.D. at 79. *Ungar* does not deal with tying in terms of causation in private antitrust litigation as required by *Zenith v. Hazeltine*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

did not intend to release this particular claim when they sold a store back. Ergo, another issue of fact is raised requiring examination of the intent of each of 127 parties who executed such a release. Indeed, the existence of the plaintiffs' claim could well be submerged in the welter of possibly conflicting, contradictory and disparate claims by other franchisees, each vying for its full share of judicial attention."

If any one of the releasors, and the class includes many of them, remained in this action, and his release were challenged, the enforceability of each release would turn on an individualized examination of intention surrounding each release.

The defendant has asserted a number of counterclaims against the plaintiff and many class members who would become involved in the instant action if it were certified as a class action. The existence of such counterclaims multiplies further the individual issues. The defendant's first and second counterclaims against the named plaintiff, for example, are for money owed on a promissory note in the amount of $30,113.10 and for goods sold and delivered in the amount of $44,939.53.

In addition to the individual issues raised by the counterclaims, the plaintiff's answer to the counterclaims raises a number of further issues requiring individual inquiry. The plaintiff argues that defendant's counterclaims should be transferred to courts in the places where the claims arose. But this would only proliferate litigation and work against the policy of Rule 23. As the Court stated in *Cotchett v. Avis Rent A Car System, Inc.,* 56 F.R.D. 549, 552 (S.D.N.Y. 1972):

"At the least, it is difficult to say that the common issues justify a unitary action where, at this early stage, it seems likely that such unity will be substantially splintered by the counter-

claims into a myriad of separate trials."

■ The record here, against which the requirements of Rule 23 must be measured, leads the Court to conclude that under subdivision (b)(3) questions of law and fact affecting only individual members predominate over any questions common to the members of the class.

■ The third and fourth prerequisites of subdivision (a) of Rule 23 are that the claim of the representative party be typical of the claims of the class and that the representative party will fairly and adequately protect the interests of the class. These two requirements are often considered coextensive. *3B Moore's Federal Practice,* ¶ 23.06–2 at 23–325 (1974). The plaintiff's burden under these requirements is a heavy one. In commenting on this burden the Court, in *Thompson v. T. F. I. Companies, Inc.,* 64 F.R.D. 140, 148 (N.D.Ill.1974), had the following to say:

"The adequacy requirement must be 'strictly construed and stringently applied, since many absent class members will be bound by the judgment.' "

As a former customer of the defendant, the plaintiff's claim is not typical of those who remain as customers. He is now in a completely different and unrelated line of endeavor. Many members of the class are still customers of the defendant. The plaintiff seeks to represent them all, · both past and present customers.

■ Courts have recognized that potential antagonistic interests between a past and a present customer is a ground for denying class certification. One does not have to show actual antagonistic interests; the potentiality is enough. As Judge McLaren stated in *McMackin v. Schwinn Bicycle Co.,* 1974 Trade Cases ¶ 75,047 (N.D.Ill.1973), in footnote 1 on p. 96,689:

"In short, when antagonisms can be foreseen at this stage, the party seek-

ing certification of a class has a heavy burden."

The plaintiff has different interests from those of the wholesalers, dealers, growers, ranchers and farmers who have continuing and harmonious relationships with the defendant but who are, nonetheless, members of the class the plaintiff seeks to have created. Under these circumstances the plaintiff is not in a position individually to determine the best courses of action for each class member. His litigious approaches could be disruptive of the close relationship between the defendant and its customers.

None of the present customers of the defendant have sought to intervene in this action even though it has been pending since September, 1973. The courts have recognized, as a negative factor to class certification, this lack of interest in entering the legal arena. As stated in *Lupia v. Stella D'Oro Biscuit Co.*, 1974 Trade Cases ¶ 75,046 (N.D.Ill. 1972):

"The inference that current distributors have antagonistic interests is strengthened by the observation that not one has intervened in the action up to now." (at p. 96,688).

The next class action requirement is in subdivision (b)(3) of Rule 23, which provides that the court must find that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

In evaluating the superiority requirement, the absence of other actions by class members, as under typicality, is a relevant and significant consideration. If there were a substantial number of actions of a similar nature filed in this or other courts, this would be a factor favoring class certification. However, in the case at bar precisely the opposite is true. This Court is unwilling to breathe the spirit of judicial combat into approximately 6,500 persons who have shown no desire to litigate the contract provisions.

Further, the class action device here is not superior because of the multitude of individual issues existing with respect to liability and damages. In *McMackin v. Schwinn Bicycle Co.*, 1974 Trade Cases ¶ 75,047 (N.D.Ill.1973), in dealing with the question of "superiority", the Court said (at p. 96,690):

"This is not a case . . . where claimed price fixing conspiracies raised prices to various classes of purchasers, with the result that 'fact of damage' was no issue and fixing 'amount of damage' was primarily an accounting exercise. In this case, the impact ('burdensomeness') upon Schwinn dealers, past and present, of the alleged tie-in clause would have to be determined individually both as to fact and amount of damages. Such a task could quickly become far from fair and efficient."

Here the plaintiff has urged that severed trials of the liability and damage issues would be the superior way to proceed. Such a proposal was considered and rejected by the court in *Transit Co. Tire Antitrust Litigation*, 67 F.R.D. 59, at pp. 74 (W.D.Mo.1974):

"In the instant litigation, it is not at all clear that the issues of 'liability' and damages can be fully separated so that a successful class action as to 'liability only' will resolve all issues but the amount of monetary damage each class member is entitled to. And, even if it could be said to a reasonable certainty that such separation was possible, this Court questions the interests of judicial economy and the superiority of a class action which requires all of the class members to enter an appearance and establish the amount of their monetary damage in a court which may be thousands of miles from their place of business. When the benefits of a class determination of violation and possible injury are weighted against the expenses which the class members must incur by litigation in a distant forum, the incon-

venience to the parties and witnesses, the administrative problems involved, and the problems of notice to the class members, the resulting balance reveals that the class action device offers no superiority over the individual litigation of claims. When there exists a substantial possibility that individual questions relating to injury will also be litigated in the individual 'damage' trials, the lack of superiority of the class action device becomes clearer.

"For the reasons stated, the Court finds that the issues of law and fact common to the class alleged herein do not predominate over the issues which may affect only individual class members. Plaintiffs' proposal for a class declaration on the issues of 'liability only', even if accepted, does not alter this finding for the reason that on the issues of liability, including injury, common questions do not predominate within the meaning of Rule 23(b)(3)."

■ Even if the other prerequisites could be shown, the plaintiff must demonstrate that a class action is the best means of resolving the controversy. The Rule does not say that the class vehicle must be "as good as" or "almost as good as" some other available method. The word chosen was "superior".[3] Thus, if, as here, the maintenance of a case as a class action presents problems not present in some other procedural alternative, it clearly is not superior to all other methods.

■ Manageability is a factor of major importance in the consideration of any motion to certify under Rule 23. In this case, where there is a predominance of individual issues, class certification may properly be denied on that ground alone. Additional factors indicating lack of manageability are the size of the individual claims and the numerous counterclaims; the number and wide dispersal and disparity of the defendant's customers; the large number of feed manufacturers in every area of the country; the wide range of products involved, varying by time, location, customer preference, and animal dissimilarity; the varying instruments and terms of sale, including discount payment terms and freight rates; the variable financial assistance available to different customers in different markets at different times; and the individualized proof as to financial and credit standing of each class member and the multitude of facts on causation respecting each class member.

In this case the issues relating to impact and amount of damages further indicate lack of manageability. The following facts bring this into focus. The defendant manufactures many distinct feed products. These products involve many different feed formulations and are manufactured at many different plants throughout the country. The defendant's customers feed the spectrum of livestock and poultry. The feed purchased depends upon customer preferences, climatic conditions, the true cost as measured by price per unit together with the conversion factor, palatability, vitamin and health supplements, medication, and availability in the given area. Efforts to compare true costs and efficiencies of competitive feeds are extremely difficult. Under these circumstances, the ascertainment of impact and amount of individual damages for more than 6,500 class members is realistically an unmanageable task.

*Shaw v. Mobil Oil Corp.*, 60 F.R.D. 566 (D.N.H.1966), a case arising under the Sherman Act, involved an attempt to create a much more modest class of 108 gasoline dealers, all located in Maine and New Hampshire. Class certification was denied because of the lack of manage-

---

3. This point is made succinctly in several cases which have construed the superiority requirement. *See, e. g., Hoffman v. Charnita, Inc.*, 58 F.R.D. 86, 91 (M.D.Pa.1973); *Cotchett v. Avis Rent A Car System, Inc.*, 56 F.R.D. 549, 552–53 (S.D.N.Y.1972); *Buford v. American Finance Company*, 333 F.Supp. 1243, 1250 (N.D.Ga.1971).

ability in ascertaining damages, a "mini-trial" being required in the case of each dealer. The Court stated (60 F.R.D. at 570):

> "In summary, it can be said that the damages aspect of this case predominates. With regard to the antitrust claims, each member would have to prove in a separate 'mini-trial', both impact and amount of damages. Neither plaintiff's nor any other member's proof in respect of these issues would be dispositive of claims made by other class members."

██ Finally, the utilization of the class action device does not justify disregarding the procedural safeguards established by the Constitution, by congressional mandate or by the Federal Rules of Civil Procedure. See *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1013 (2 Cir. 1973), remanded on other grounds in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). One of these safeguards is the right to trial by jury, and this case is to be so tried. In *Cotchett v. Avis Rent A Car System, Inc.*, 56 F.R.D. 549, 553 (S.D.N.Y.1972), the manageability problems in such a jury trial situation were recognized, with the Court quoting with approval from *Schaffner v. Chemical Bank*, 339 F.Supp. 329, 337 (S.D.N.Y. 1972):

> " ' . . . the notion of utilizing a jury trial in a class suit containing the varied problems certain to abound herein, is enough to chill any further discussion of the required superiority of a class claim over other available methods for the fair and efficient adjudication of the controversy. . . . And one might relevantly ask—what public interest would be served by devoting the public's facilities in this way and what just purpose requires such a colossal marshalling of judicial resources and their supporting personnel? ' "

If this case were to be certified as a class action, the ascertainment of the individual amounts of damages alone would remain an unmanageable task. As the Court stated in *Ralston v. Volkswagenwerk, A. G.*, 61 F.R.D. 427, 432–33 (W.D. Mo.1973):

> "I can find nothing to indicate that Rule 23 has abrogated the traditional means of measuring individual damages. If damages were to be awarded in this action, they should not be based on speculation or a system of averaging. Rather, the compensation due each individual member of the class must necessarily reflect the damages actually suffered by that party. Any individual member of the class should have the right to come forward with evidence . . .. A recognition that each member of the class would have a right to come into court and give evidence raises staggering problems of logistics. Manageability could not be assured, or even predicted. To afford manageability by impinging upon substantial rights—or duties—to present individualized evidence is not an acceptable goal of a class action."

██ The Court is compelled to conclude that to proceed under Rule 23 F.R. C.P. would produce a case of unmanageable proportions.

██ The plaintiff also cites subdivisions (b)(1) and (b)(2) of Rule 23 as possible subdivision (b) alternatives for proceeding in this case under the class format. However, the invocation of (b)(1) and (b)(2) are not appropriate here because (1) there is no danger that separate actions will result in inconsistent adjudications imposing incompatible standards of conduct upon the defendant, (2) the disposition of this action will not impair the ability of alleged class members to prosecute any claims they may have against the defendant, and (3) the primary relief sought by the plaintiff is a treble damage recovery under the anti-

**456**

trust laws. *Al Barnett & Son, Inc. v. Outboard Marine Corp.*, 64 F.R.D. 43 (D.Del.1974); *Bogosian v. Gulf Oil Corp.*, 62 F.R.D. 124 (E.D.Pa.1973); *LaMar v. H. & B. Novelty & Loan Company*, 489 F.2d 461 (9 Cir. 1973).

The Court determines that this case shall not proceed as a class action. The plaintiff, for the reasons above discussed, has failed to satisfy the burden placed upon him by Rule 23.