**Carl L. CUTLER, et al., Plaintiffs,**

v.

**LEWISTON DAILY SUN, Defendant.**

**Civ. No. 84–0042–P.**

United States District Court,
D. Maine.

June 17, 1985.

Robert S. Hark, Isaacson, Hark & Epstein, Lewiston, Me., for plaintiffs.

Judith W. Andrucki, Normand R. Croteau, Marshall Raymond & Beliveau, P.A., Lewiston, Me., L. Michael Zinser, King Barlow & Little, Nashville, Tenn., for defendant.

## MEMORANDUM OF DECISION ON DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

GENE CARTER, District Judge.

### MOTION FOR SUMMARY JUDGMENT

This case is before the Court on Defendant's second motion for summary judgment. Defendant's first motion for summary judgment, filed July 24, 1984, was denied because Defendant had failed to file with the Court necessary materials in support of its factual assertions. *See Cutler v. Lewiston Daily Sun,* 103 F.R.D. 172 (D.Me.1984). Defendant filed the pending motion for summary judgment, with appropriate supporting materials, on October 17, 1984.

Defendant publishes three newspapers, *The Lewiston Daily Sun, The Lewiston Evening Journal,* and *Sunday.* Plaintiffs are present or former subscribers to one or more of Defendant's newspapers. The controversy in this antitrust case arises out of

the marketing techniques used by Defendant with respect to *Sunday,* a Sunday newspaper which Defendant began publishing in October of 1983.

Plaintiffs allege that Defendant substantially raised the price of home delivery of its daily newspapers prior to commencing publication of *Sunday.* In October 1983, Defendant began distribution of *Sunday* to subscribers to its daily newspapers, Plaintiffs allege, without charge to subscribers. Plaintiffs allege that beginning on February 10, 1984, Defendant began to charge its home delivery subscribers for *Sunday* by raising the rate for weekly subscriptions to its daily newspapers from $1.55 per week to $1.90 per week. Plaintiffs also allege that beginning on February 10, 1984, Defendant refused to provide its subscribers with home delivery of its daily newspapers unless subscribers also purchased *Sunday.*

Plaintiffs allege that Defendants enjoy a "virtual monopoly" in their geographic market and that they have utilized their monopoly power to both increase the price of their daily newspapers and to tie the sale of *Sunday* to the sale of their daily newspapers. Plaintiffs contend that this alleged use of their monopoly power to increase prices and to tie the sale of their Sunday newspaper to their daily newspapers violates sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and section 3 of the Clayton Act (15 U.S.C. § 14). Plaintiffs request a permanent injunction restraining Defendant from tying the sale of *Sunday* to the sale of its daily newspapers and treble damages under section 4 of the Clayton Act (15 U.S.C. § 15).

### I. *Standing*

■ Defendant argues that Plaintiffs lack standing to maintain this action under Section 4 of the Clayton Act. Defendant concedes that a direct purchaser of a tied product, that is, a party directly subject to the tie, has standing to maintain an action under section 4 of the Clayton Act. *See Southern Concrete Co. v. U.S. Steel Corporation,* 535 F.2d 313, 317 (5th Cir.1976); *Warner Management Consultants v. Data General Corporation,* 545 F.Supp.

956 (N.D.Ill.1982). Defendant contends, however, that an indirect purchaser lacks standing and that the undisputed facts show that Plaintiffs are indirect purchasers of the tied product.

■ The issue of whether Plaintiffs are indirect purchasers for purposes of antitrust law requires a determination of whether the rationale for denying standing to indirect purchasers, as articulated by the Supreme Court and inferior courts, is applicable in this case. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).

In *Illinois Brick,* the Supreme Court denied standing to an indirect purchaser who claimed damages from the antitrust violator measured by the amount that had been passed on to it. The policies that determined the outcome in *Illinois Brick* were summarized in the later case of *Blue Shield:*

> ... the Court found unacceptable the *risk of duplicative recovery* engendered by allowing both direct and indirect purchasers to claim damages resulting from a single overcharge by the antitrust defendant. *Illinois Brick,* supra [431] at 730–31, 97 S.Ct. 2061 [at 2066–69], 52 L.Ed.2d 707. The Court found that the *splintered recoveries and litigative burdens* that would result from a rule requiring that the impact of an overcharge be apportioned between direct and indirect purchasers could undermine the active enforcement of the antitrust laws by private actions. 431 U.S. at 745–47, 97 S.Ct. 2061 [at 2074–75], 52 L.Ed.2d 707. The Court concluded that direct purchasers rather than indirect purchasers were the injured parties who as a group were most likely to press their claims with the vigor that the § 4 treble-damages remedy was intended to promote. Id., at 735, 97 S.Ct. 2061 [at 2069], 52 L.Ed.2d 707.

*Id.* at 474, 102 S.Ct. at 2546 (emphasis added). In *Blue Shield,* the plaintiff was found to have standing even though she

was not a direct purchaser from the defendant. *Id.* at 475, 102 S.Ct. at 2546. The Court found that the danger of duplicative recovery was not present. *Id.*

The Supreme Court cases do not mandate a mechanical test focused only upon whether an intermediary stands between a defendant seller and a plaintiff purchaser. Rather, the Court must determine whether permitting plaintiffs to maintain the action will create a risk of duplicative recovery or the need to engage in complex apportionment of damages. *See Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 968 (3d Cir.1983). Defendant contends that it "wholesales" newspapers to carriers who then resell to nonsubscribers. Plaintiffs argue that the carriers are employees acting under the control of the Defendant. The parties identify the issue as whether the carriers are employees or independent contractors under common law principles. Narrowly considered, however, the issue is whether the carriers stand in such a relationship to Defendant that they would be able and likely to bring their own antitrust claims against Defendant, thereby creating a risk of duplicative recovery or complex damage apportionment. The nonexistence of an employment relationship under common law principles will not necessarily bar Plaintiffs' action. Courts applying *Illinois Brick* have recognized that an indirect purchaser has standing if the intermediary is under the control of the defendant. *See Royal Printing, Inc. v. Kimberly-Clark Corporation,* 621 F.2d 323 (9th Cir.1980); *In re Sugar Industry Antitrust Litigation,* 579 F.2d 13 (3d Cir.1978); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 497 F.Supp. 218, 226–27 (C.D.Cal.1980). In *Royal Printing,* the Court of Appeals for the Ninth Circuit held that a plaintiff buying from a subsidiary of a defendant co-conspirator in a price-fixing scheme could sue the defendant because the risk that the defendant's subsidiary would sue the defendant's co-conspirators, creating a danger of multiple recovery, was slight. In *Sugar Industry Antitrust Litigation,* the

Court of Appeals for the Third Circuit reached a similar result, explaining:

> Although the subsidiary does have a separate legal existence, it is owned by the parent company, and would not ordinarily sue it. After considering all of the facts in this case, we conclude that, at least for this purpose and in this context, the subsidiary should be treated as the alter ego of the parent. To adopt any other view would invite evasion by the simple expedient of inserting a subsidiary between the violator and the first noncontrolled purchaser.

*Id.,* 579 F.2d at 18–19 (citation omitted).

This case does not involve a corporate subsidiary. However, the principles set forth in the above-cited cases apply equally to this case. The question to be determined is whether the carriers are under the control of the Defendant. The existence or nonexistence of an employment relationship is relevant. Also significant, however, are considerations bearing upon the extent of the carriers' freedom to participate as purchasers in the market for Defendant's product. If the terms of the relationship between the carriers and Defendant requires that the carriers sell Defendant's products exclusively, they are not in a position to be harmed by an inability to exercise an election to purchase from Defendant's competitors. Also important is the likelihood, as a practical matter, that carriers would bring their own actions against Defendant. Other factors may prove relevant as the record is developed. Genuine issues of fact material to the question of whether the carriers are controlled by Defendant remain to be decided; thus, summary judgment on the basis of standing must be denied.

Defendant also relies on the decision of the First Circuit Court of Appeals in *Engine Specialties, Inc. v. Bombardier, Limited,* 605 F.2d 1 (1st Cir.1979). In *Bombardier,* the First Circuit applied the "target area" test of standing under section 4 of the Clayton Act, 15 U.S.C. § 15, to determine that an indirect purchaser from a defendant manufacturer who had conspired

to divide markets in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, did not have standing to bring the action. Thus, a distributor who purchased directly from the defendant was permitted to sue, but subdistributors purchasing from the plaintiff distributor lacked standing. The Court found that the anticompetitive conspiracy was not aimed at the market level at which the subdistributors were operating. *Id.* at 18. Rather, the subdistributors belonged "to that class 'who have suffered economic damage by virtue of their relationships with "targets" ... rather than by being "targets" themselves.'" *Id.* (quoting *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir.1971)).

*Bombardier* does not require any deviation from the analysis set forth above. In this case, there is a genuine issue of material fact as to whether the newspaper carriers are controlled by Defendant. Resolution of the questions as to whether Plaintiffs were "targets" of the alleged anticompetitive acts, that is, whether the acts were aimed at the market level at which Plaintiffs operate, requires determination of issues of fact. Summary judgment, therefore, is improper under *Bombardier.*

## II. *Antitrust Injury*

Defendant contends that Plaintiffs have suffered no "anti-trust injury." The concept of "antitrust injury" is beleaguered by doctrinal confusion. *See Warner Management Consultants v. Data General Corp.*, 545 F.Supp. 956, 962 (N.D.Ill.1982). It is not surprising, therefore, that Defendant has attempted to incorporate two disparate doctrines under the banner of "antitrust injury." Defendant relies on cases addressing two distinct issues, one of which does not properly fall under the heading of "antitrust injury." The first of these issues is whether the *challenged conduct* violates the antitrust laws. The second is whether the *particular plaintiff* has suffered injury, flowing from the challenged conduct, of the type the antitrust laws were intended to prevent. The latter issue is properly designated "antitrust injury."

### A.

First, it must be determined whether there exists a genuine issue of fact material to whether Defendant's conduct violates the antitrust laws. A tying arrangement is a form of conduct which has been condemned as unlawful *"per se."* The *"per se"* rule was first enunciated in *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). The Supreme Court most recently analyzed the elements of a tying arrangement in the case of *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984).

In *Jefferson Parish*, the Court stated that *"per se"* condemnation comes into play only when the existence of forcing is "probable." *Id.*, 466 U.S. ____, 104 S.Ct. at 1560, 80 L.Ed.2d at 15. As a threshold matter, there must be a "substantial potential for impact on competition," and a "substantial volume of commerce" must be foreclosed. *Id.* The Court gave the following examples:

> If only a single purchaser were "forced" with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law.

> . . . . .

> Similarly, when a purchaser is "forced" to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

*Id.*

The undisputed facts in this case indicate that Plaintiffs Blackburn and Cutler have not altered their habits with respect to purchase of other Sunday newspapers. Plaintiff Baird testified that he did not purchase Sunday newspapers prior to Defendants' introduction of its current marketing scheme. With regard to *these plaintiffs*, therefore, it is undisputed that

Defendant's conduct has not harmed competition in the market for sale of Sunday newspapers. Their purchasing habits simply have not changed.

■ With respect to the threshold inquiry, the question becomes whether, as a matter of law, Plaintiffs' failure to alter their buying habits negates the existence of a "substantial potential for impact on competition." The existence of questions of fact preclude decision on this issue as a matter of law. Although these plaintiffs have alleged no change in their buying habits, the record indicates that all home subscribers are subject to the marketing scheme of which Plaintiffs complain. Plaintiffs have submitted an affidavit indicating that the circulation of the *Maine Sunday Telegram,* a competitor of Defendant's Sunday newspaper, has decreased in the Lewiston area since Defendant introduced its marketing scheme.[1] Affidavit of Robert Marcille. These facts are sufficient to generate a genuine issue of material fact as to whether there exists a substantial potential for impact on competition.

■ Once the threshold showing of a substantial potential for impact on competition is surmounted, *"per se"* condemnation is appropriate "if anticompetitive forcing is likely." *Jefferson Parish,* 466 U.S. ___, 104 S.Ct. at 1560, 80 L.Ed.2d at 15. Anticompetitive forcing will be likely if, for example, the seller has a patent for the tying product, the seller's share of the market for the tying product is high, or the seller offers a unique product that competitors are not able to offer. *Id.,* 466 U.S. at ——-——, 104 S.Ct. at 1560–1561, 80 L.Ed.2d at 15–16. In other words, there must be a showing that the seller has sufficient market power with respect to the tying product to engage in anticompetitive forcing with respect to the tied product. In this case, Plaintiffs have alleged that Defendant enjoys a "virtual monopoly" in the market for the tying product. Obviously, there remain genuine issues of fact respecting both definition of the relevant market and Defendant's degree of power within that market.

### B.

Having determined that Plaintiffs' allegation that the challenged conduct violates the antitrust laws survives this Motion for Summary Judgment, the Court must decide whether there is a genuine issue of fact as to whether Plaintiffs have suffered antitrust injury.

"The analytical distinction between standing and antitrust injury is somewhat elusive." *Engine Specialties, Inc. v. Bombardier Ltd.,* 605 F.2d 1, 12, n. 6 (1st Cir.1979). Some courts have treated antitrust injury as a component of the standing doctrine. *See, e.g., John Lenore Co. v. Olympia Brewing Co.,* 550 F.2d 495 (9th Cir.1977); *Warner Management, supra,* 545 F.Supp. at 962. The Court of Appeals for the First Circuit has stated in a footnote that it regards the two doctrines as conceptually distinct. *Bombardier, supra,* 605 F.2d at 12, n. 6. This Court is satisfied that, at the very least, the concept of antitrust injury includes an analytical component not present in the standing analysis set forth in Part I of this Memorandum. As defined by the Supreme Court, antitrust injury is

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50

---

1. This evidence may cut either way; it may well be regarded as evidence suggesting that competition for Sunday newspaper readers in Maine has *increased* since Defendant introduced *Sunday.* The Court takes note of this affidavit here only for the limited purpose of indicating that there exists a genuine issue of material fact as to the existence of a substantial potential for impact on competition.

L.Ed.2d 701 (1977) (citation omitted). In this case, the Court is satisfied that Plaintiffs have sufficiently alleged injury in fact, that is, being forced to purchase a product they do not want. It must be determined, then, whether this injury may be characterized as "antitrust injury."

The competitive injury caused by tying arrangements is that purchasers are precluded from entering the market for products competing with the tied product, thereby foreclosing competition in the market for the tied product. *United States v. Loew's, Inc.,* 371 U.S. 38, 44–45, 83 S.Ct. 97, 101–102, 9 L.Ed.2d 11 (1962); *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953); *Warner Management, supra,* 545 F.Supp. at 967. The three Plaintiffs in this case have testified at their depositions that they have not been precluded from participating in the market for the tied product. Their buying habits have not changed; Plaintiffs Blackburn and Cutler continue to purchase competing Sunday newspapers, and Plaintiff Baird does not wish to purchase *any* Sunday newspaper. The Court has already determined that there exist genuine issues of fact material to the questions as to whether Defendant's marketing scheme has a substantial potential for impact on competition and as to whether anticompetitive forcing is likely. Plaintiffs' alleged injury, being forced to purchase an unwanted product, is the primary effect of the alleged tying arrangement; its secondary effect, foreclosure of competition in the market for the tied product, is what would raise Defendant's conduct to the level of an antitrust violation. The coercion to which Plaintiffs allegedly are subject is both the source of their direct injury and an essential element of a tying claim. Must Plaintiffs also show that they have been entirely foreclosed from participating as buyers in the market for the tied product? On this Motion for Summary Judgment, it is enough that they have alleged that they are effectively paying a penalty—purchase of Defendant's product—in order to participate in the market for the tied product. The question

whether their being coerced to purchase Defendant's Sunday newspaper actually confines their freedom to participate in the market for the tied product should be decided by the trier of fact.

Defendant argues that the First Circuit Court of Appeals decision in *A.D.M. Corp. v. Sigma Instruments, Inc.,* 628 F.2d 753 (1st Cir.1980), demonstrates that, as a matter of law, there is no antitrust injury. The *A.D.M.* case is readily distinguishable. The plaintiff corporation in that case contended that the sale of its assets by its parent for an inadequate price violated antitrust laws. The First Circuit concluded that there was no antitrust injury because any injury to *competition* would derive from the mere fact of the sale, but that A.D.M.'s only injury was the failure to be fairly compensated for its assets. Thus, there was "lacking the essential connection between injury and the antitrust laws necessary to give appellant standing." *Id.* at 754. In this case, Plaintiffs and other persons similarly situated are *necessarily* the agencies of the alleged antitrust violation; coercion of Plaintiffs is an essential element of the tying claim. There is at least a genuine issue of fact as to whether there is sufficient connection between the injury and the aims of the antitrust law. Accordingly, summary judgment with respect to the issue of antitrust injury must be denied.

### III. *Single Product Defense*

Defendant argues that its Sunday newspaper and its daily newspapers combined constitute a "single product" and that, therefore, there can be no unlawful tying arrangement. A tying arrangement cannot exist unless two distinguishable product markets are involved. *See Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, ___–___, 104 S.Ct. 1551, 80 L.Ed.2d 2, 17–18 (1984); *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953). In *Jefferson Parish,* the Supreme Court stated that "the answer to the question whether one or two products

are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." 466 U.S. ____, 104 S.Ct. at 1562, 80 L.Ed.2d at 17 (footnote omitted). A tying arrangement must "link two distinct markets for products that [are] distinguishable in the eyes of buyers." *Id.*, 466 U.S. at ――――, 104 S.Ct. at 1562, 80 L.Ed.2d at 17–18 (footnote omitted).

■ In this case, the record is replete with issues of fact pertaining to the existence of distinguishable product markets. Plaintiffs cite evidence indicating that Defendant's Sunday newspaper differs significantly in character from its daily newspapers, and that Defendant intends that it should be differently perceived by buyers. Defendant attempts to glean from previously decided cases a rule of law that different editions of the same newspaper are not separate products. The Court does not agree that such a rule exists. The Supreme Court case upon which Defendant relies, *Times-Picayune, supra,* is distinguishable. Plaintiffs in that case were advertisers complaining that they were forced to purchase space in both the morning and evening editions of Defendant's newspaper. The Supreme Court clearly grounded its decision upon advertisers' perceptions of the nature of the product, noting that the fact "that readers consciously distinguished between these two publications does not necessarily mean that advertisers bought separate and distinct products...." *Id.,* 345 U.S. at 613, 73 S.Ct. at 883.

Genuine issues of fact material to the "single product defense" exist, and summary judgment may not be granted on this ground.

### IV. *Availability of Single Copies*

■ Defendant argues that the availability of single copies of each of its newspapers on newsstands negates the tying claim. Because Plaintiffs may purchase as few or as many editions of Defendant's newspapers from newsstands as they please, Defendant contends, Plaintiffs may easily avoid the alleged tying arrangement. Plaintiffs respond that the "product" is the

newspaper coupled with the home delivery. Plaintiffs' theory is that the availability of single copies on newsstands is irrelevant because the tying product is the *home-delivered* daily edition of the newspaper, which is sufficiently desirable or unique that its sale only in connection with the Sunday edition "coerces" the subscriber to purchase the Sunday edition.

An oft-cited footnote from the Supreme Court's decision in *Northern Pacific Railway Company v. United States* provides:

Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price.

*Id.,* 356 U.S. 1, 6, n. 4, 78 S.Ct. 514, 518, n. 4, 2 L.Ed.2d 545 (1958). Subsequent judicial decisions have also made clear that offering a discount on one product only on condition that it is purchased with a separate product is not unlawful. *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Systems, Inc.,* 732 F.2d 1403 (9th Cir. 1984). In other words, sale of two products in combination at a lower price than the total price of the products purchased separately does not offend the antitrust laws.

In this case, Plaintiffs do not dispute that single copies of Defendant's newspapers are available at more than 500 retail outlets. Buyers, therefore, are free to take either product by itself. *See Northern Pacific, supra.* The price for a single copy of the daily editions of Defendant's newspaper is $.30. The price for a single copy of Defendant's Sunday edition is $.60. The total cost for one week, if each newspaper is purchased separately, is $2.40. The price for home delivery of all newspapers is $1.90 per week. Home delivery is only available, however, if subscribers agree to purchase both the Sunday and the daily editions. Obviously, subscribers obtain the benefit of a lower price per copy if they purchase all editions as a package. Additionally, they obtain the benefit of home delivery. Home delivery is not available if fewer than all editions are purchased.

■ Plaintiffs would have the Court characterize home delivery as being part of the "product." Plaintiffs' theory, in essence, is that a home-delivered newspaper is a different product from one sold by a retailer. Thus, Plaintiffs argue, the fact that single copies of newspapers are available on newsstands cannot negate the existence of a tying arrangement with respect to home-delivered newspapers. Whatever doubts the Court may entertain about this theory, it is satisfied that the question whether a home-delivered newspaper is the same product as that sold at retail is an outstanding issue of fact which precludes summary judgment.

### V. *Injury in Fact*

Defendant also argues that Plaintiffs have suffered no cognizable injury because the price charged for the package is less than they would pay for individual copies purchased from retail outlets. *See supra,* part IV of this Memorandum. Defendant insists that Plaintiffs cannot complain because they have received a more favorable price than they would have had they purchased single copies.

■ Under Section 4 of the Clayton Act, a plaintiff must demonstrate injury in fact in order to recover damages. *See, J. Truett Payne Company, Inc. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981); *Kypta v. McDonald's Corp.,* 671 F.2d 1282, 1285 (11th Cir.1982). In this case, Plaintiffs have alleged injury in fact. It is undisputed that persons subject to the alleged tie pay a lower price for the allegedly tied product than do persons purchasing individual copies. The injury Plaintiffs allege, however, is being coerced to purchase a product they do not want, regardless of the price. To be forced to pay for a product that has no value to the purchaser is injury in fact. *See Jefferson Parish, supra,* 466 U.S. ——, 104 S.Ct. at 1558, 80 L.Ed.2d at 13.

### VI. *Section 3 of Clayton Act*

■ Defendant also contends that Plaintiffs' claim under section 3 of the Clayton Act, 15 U.S.C. § 14, should be dismissed because Plaintiffs have not alleged Defendant's marketing scheme requires that Plaintiffs "not use or deal in the goods ... of a competitor of the ... seller." 15 U.S.C. § 14. A condition requiring that a buyer purchase a tied product from the Defendant is sufficient to make out a section 3 violation; section 3 has not been interpreted to require that there be an express prohibition on the purchase of goods from a defendant's competitors. *See, e.g., Unijax, Inc. v. Champion International, Inc.,* 683 F.2d 678, 685 (2d Cir.1982). Therefore, Plaintiffs' claim under section 3 of the Clayton Act will not be dismissed.

## MOTION FOR CLASS CERTIFICATION

Plaintiffs have moved pursuant to Fed.R. Civ.P. 23 for certification of this case as a class action. Plaintiffs wish to certify a class consisting of all persons who obtain home delivery of either the Lewiston *Sun* or the *Evening Journal,* or a total of 31,-503 subscribers.

■ Class certification is improper in this case, where there has been no allegation that all or any of the subscribers have suffered injury actionable under Section 4 of the Clayton Act. Section 4 of the Clayton Act permits "[a]ny person who *shall be injured in his person or property*" by a violation of the antitrust laws to sue for treble damages. 15 U.S.C. § 15. Injury in fact is an essential element of a cause of action under this section. *J. Truett Payne v. Chrysler Motors Corporation,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); *Kypta v. McDonald's Corp.,* 671 F.2d 1282 (11th Cir.1982). A private litigant charging an antitrust violation must not only prove the violation, but also must prove that he has been damaged thereby. *Gray v. Shell Oil Company,* 469 F.2d 742 (9th Cir.1972).

In ruling on Defendant's Motion for Summary Judgment, the Court determined that Plaintiffs had alleged injury in fact. A review of the undisputed facts, however,

offers no basis for an allegation that all or any members of the putative class had suffered compensable economic injury. If purchased at newsstands, all seven editions would cost a consumer $2.40 per week, at $.30 for the editions published Monday through Saturday and $.60 for the Sunday newspaper. Prior to the date when home delivery of *Sunday* commenced in October 1983, subscribers paid $1.55 per week for home delivery of six daily editions of Defendant's newspaper. The price for home-delivered newspapers was increased to $1.90 in February of 1984. Assuming that this increase reflected a charge for the Sunday edition, it amounted to only $.35, which is considerably below the retail price of $.60. Measured in another way, the cost of purchasing *Sunday and* obtaining home delivery of Defendant's newspapers is only $.10 per week, because the retail price of the Monday through Saturday editions is $1.80.

By either measure, it cannot be said that the charge for the allegedly tied product, the Sunday newspaper, is equal to or greater than fair market value. Therefore, injury in fact must be premised upon a showing that Plaintiffs are being forced to pay for an *unwanted* product, no matter how small the amount. Subscribers who desire to obtain the Sunday edition of the newspaper are likely to perceive the package price as a *benefit*, the retention of which might be threatened by the successful prosecution of this antitrust action.

 Plaintiffs have the burden of establishing their right to maintain a class action under Rule 23. *Wilson v. Zarhadnick*, 534 F.2d 55, 57 (5th Cir.1976); 7A C. Wright & A. Miller, *Federal Practice and Procedure*, § 1798 at 244. A court has broad discretion in deciding whether a class action may be maintained. *Gilbert v. City of Little Rock, Arkansas*, 722 F.2d 1390, 1399 (8th Cir.1983); 7A C. Wright & A. Miller, *supra*, § 1785 at 134. In this case, the Court need not engage in detailed anal-

ysis of Plaintiffs' motion under the specific provisions of Rule 23 because there exists serious doubt as to whether the members of the proposed class have standing to sue or any interest in suing. This is a fundamental failing in Plaintiffs' Motion for Class Certification. If members of the putative class cannot allege injury in fact, or have interests antagonistic to those of the named claimants, it is obvious that the prerequisites set forth in Rule 23(a) are not satisfied. Plaintiffs have not shown that the claims of the representative parties are typical of those of the class, that the representative parties will fairly and adequately protect the interests of the class, or that the class is so numerous that joinder of all members is impracticable.

 The potentiality of antagonistic interests between putative class members is itself sufficient ground to deny class certification. *Plekowski v. Ralston Purina Company*, 68 F.R.D. 443, 452 (M.D.Ga. 1975). The lack of interest in entering the legal arena expressed by putative class members is one factor that militates against class certification. *Id.* at 453. Here, no putative class members have sought to intervene. Plaintiffs' attorney stated at oral argument that he has received petitions from persons supporting Plaintiffs' litigating position, but these have not been submitted for the Court's consideration.[2] Under these circumstances, this Court, like the Court in *Plekowski, supra*, is "unwilling to breathe the spirit of judicial combat into approximately [31,000] persons who have shown no desire to litigate...." *Id.* at 453. Plaintiffs' Motion for Class Certification must be denied.

### ORDER

Accordingly, it is ORDERED:

(1) that Defendant's Motion for Summary Judgment be, and is hereby, DENIED;

---

**2.** The Court notes that the fact that there may be others who support Plaintiffs' position does not vitiate the Court's concern that the broadly defined proposed class may well include persons with disparate interests with respect to matters material to this lawsuit.

(2) that Plaintiffs' Motion for Class Certification be, and is hereby, DENIED.

So ORDERED.